# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,          ) | |
| )                                    | |
| Plaintiff,                    ) | |
| )                                    | |
| v.                          ) | Civil Action No. 1:08-cv-00584-PLF |
| )                                    | |
| Fox Television Stations, Inc.,      ) | |
| Licensee of Stations KMSP-TV,   ) | |
| WJBK(TV), and WTTG(TV)         ) | |
| 5151 Wisconsin Ave. NW           ) | |
| Washington, DC  20016,          ) | |
| )                                    | |
| WDAF License, Inc.,             ) | |
| Licensee of Station WDAF-TV     ) | |
| 5151 Wisconsin Ave. NW           ) | |
| Washington, DC  20016, and      ) | |
| )                                    | |
| TVT License, Inc.,              ) | |
| Licensee of Station WTVT-TV     ) | |
| 5151 Wisconsin Ave. NW           ) | |
| Washington, DC  20016,          ) | |
| )                                    | |
| Defendants.               ) | |
| )                                    | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

R. Clark Wadlow (DC Bar No. 33340)
Mark D. Hopson (DC Bar No. 394338)
James P. Young (DC Bar No. 445476)
David S. Petron (DC Bar No. 486325)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C.  20005
(202) 736-8000
mhopson@sidley.com
dpetron@sidley.com

*Attorneys for Defendants*

June 2, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

BACKGROUND ............................................................................................................... 3

ARGUMENT ...................................................................................................................... 5

I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER 18 U.S.C § 1464. ...............6

    A.    The Complaint Fails to Allege the *Scienter* Required to Violate § 1464. ...............6

    B.    The Plain Language of § 1464 Does Not Prohibit the Broadcast of
    Allegedly Indecent Images. ...................................................................................11

    C.    Even if § 1464 Reaches Visual Images, the Broadcast in Question Was
    Not Indecent, as a Matter of Law, Under the Established Scope of the
    FCC's Indecency Enforcement Regime.................................................................13

    D.    The FCC Did Not Receive a Single Facially Sufficient Complaint. ....................19

II.   THE CLAIMS ASSERTED IN THE COMPLAINT ARE BARRED BY THE
    FIRST AMENDMENT...................................................................................................23

    A.    The FCC's Indecency Policy Is Not Narrowly Tailored to Advance the
    Asserted Interest in Protecting Children................................................................23

    B.    The FCC's Indecency Policy Is Unconstitutionally Vague. .................................27

    C.    No Court Has Ever Recognized a Compelling Interest in Prohibiting the
    Type of Broadcast Alleged in the Complaint. ......................................................30

    D.    The FCC's Indecency Policy Impermissibly Relies on Subjective Criteria.........32

CONCLUSION...................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU* v. *Ashcroft*,
322 F.3d 240 (3d Cir. 2003), *aff'd*
542 U.S. 656 (2004)..................................................................................................28

*ACLU* v. *Johnson*,
194 F.3d 1149 (10th Cir. 1999) ...............................................................................28

*Action for Children's Television* v. *FCC*,
58 F.3d 654 (D.C. Cir. 1995) (*en banc*)..............................................10, 23, 30, 31

*Action for Children's Television* v. *FCC*,
852 F.2d 1332 (D.C. Cir. 1988) .......................................................13, 15, 19, 27

*Am. Amuse. Mach. Ass'n* v. *Kendrick*,
244 F.3d 572 (7th Cir. 2001) ...................................................................................28

*Arab-American Anti-Discrimination Committee* v. *City of Dearborn*,
418 F.3d 600 (6th Cir. 2005) .....................................................................................8

*Ashcroft* v. *ACLU*,
542 U.S. 656 (2004)..........................................................................3, 23, 25, 27

*Ashcroft* v. *Free Speech Coalition*,
535 U.S. 234 (2002).............................................................................................28, 30

*Baggett* v. *Bullitt*,
377 U.S. 360 (1964).....................................................................................................29

*Bantam Books, Inc.* v. *Sullivan*,
372 U.S. 58 (1963)......................................................................................................30

*Bell Atl. Corp.* v. *Twombly*,
127 S. Ct. 1955 (2007)..................................................................................................5

*Browning* v. *Clinton*,
292 F.3d 235 (D.C. Cir. 2002) .....................................................................................6

*Cleveland* v. *United States*,
531 U.S. 12 (2000)......................................................................................................13

*Cornelius* v. *NAACP Legal Defense Fund*,
473 U.S. 788 (1985)....................................................................................................33

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,
518 U.S. 727 (1995)..............................................................................25, 31

Doe v. United States,
821 F.2d 694 (D.C. Cir. 1987).........................................................................13

Edenfield v. Fane,
507 U.S. 761 (1993)...........................................................................................31

Erickson v. Pardus,
127 S. Ct. 2197 (2007)........................................................................................5

FCC v. League of Women Voters of Cal.,
468 U.S. 364 (1984)...........................................................................................30

*FCC v. Pacifica Found.,
438 U.S. 726 (1978)................................................................................. passim

Fox Television Stations, Inc. v. FCC,
489 F.3d 444 (2d Cir. 2007)..........................................................................1, 29

Gagliardo v. United States,
366 F.2d 720 (9th Cir. 1966) ..............................................................................7

Gentile v. State Bar,
501 U.S. 1030 (1991).........................................................................................29

Gibson v. Fla. Legislative Investigation Comm.,
372 U.S. 539 (1963)...........................................................................................30

Gooding v. Wilson,
405 U.S. 518 (1972)...........................................................................................30

Grayned v. Rockford,
408 U.S. 104 (1972)...........................................................................................29

Kolender v. Lawson,
461 U.S. 352 (1983)...........................................................................................29

Kowal v. MCI Commc'ns Corp.,
16 F.3d 1271 (D.C. Cir. 1994)............................................................................6

Lewis v. New Orleans,
415 U.S. 130 (1974)...........................................................................................30

Manual Enters., Inc. v. Day,
370 U.S. 478 (1962).......................................................................................8, 10

*MCI Telecomms. Corp.* v. *AT&T Co.*,
512 U.S. 218 (1994) ..................................................................................................11

*McNally* v. *United States*,
483 U.S. 350 (1987) ..................................................................................................13

*Mishkin* v. *New York*,
383 U.S. 502 (1966) ....................................................................................................7

*MPAA* v. *FCC*,
309 F.3d 796 (D.C. Cir. 2002) ................................................................................12

*New York* v. *Ferber*,
458 U.S. 747 (1982) ....................................................................................................7

*Perrin* v. *United States*,
444 U.S. 37 (1979) ....................................................................................................11

*PSINet, Inc.* v. *Chapman*,
362 F.3d 227 (4th Cir. 2004) ..................................................................................28

*R.A.V.* v. *St. Paul*,
505 U.S. 377 (1991) ..................................................................................................33

*Reno* v. *ACLU*,
521 U.S. 844 (1997) ........................................................................................ *passim*

*Sable Commc'ns of Cal., Inc.* v. *FCC*,
492 U.S. 115 (1989) ..............................................................................14, 23, 24, 26

*Scheidler* v. *Nat'l Organization for Women, Inc.*,
537 U.S. 393 (2003) ..................................................................................................13

*Smith* v. *California*,
361 U.S. 147 (1959) ....................................................................................................7

*Smith* v. *Goguen*,
415 U.S. 566 (1974) ..................................................................................................27

*Speiser* v. *Randall*,
357 U.S. 513 (1958) ..................................................................................................29

*Staples* v. *United States*,
511 U.S. 600 (1994) ....................................................................................................7

*Summit Health, Ltd.* v. *Pinhas*,
500 U.S. 322 (1991) ....................................................................................................5

*Tallman* v. *United States*,
465 F.2d 282 (7th Cir. 1972) .................................................................7

*TRW Inc.* v. *Andrews*,
534 U.S. 19 (2001) ...........................................................................10

*Turner Broad. Sys., Inc.* v. *FCC*,
512 U.S. 622 (1994)...............................................................23, 30, 31

*United States* v. *Bass*,
404 U.S. 336, 348 (1971) ..................................................................13

*United States* v. *Playboy Ent'mt Group*,
529 U.S. 803 (2000).................................................................. *passim*

*United States* v. *Ron Pair Enters., Inc.*,
489 U.S. 235 (1981)......................................................................11, 13

*United States* v. *Smith*,
467 F.2d 1126 (7th Cir. 1972) ............................................................7

*United States* v. *Williams*,
No. 06-694, slip op. (U.S. May 19, 2008) ..........................................17

*United States* v. *X-Citement Video, Inc.*,
513 U.S. 64 (1994).......................................................................6, 7, 10

*Video Software Dealers Ass'n* v. *Webster*,
968 F.2d 684 (8th Cir. 1992) ..............................................................8

*Whitton* v. *City of Gladstone*,
54 F.3d 1400 (8th Cir. 1995) ..............................................................8

## STATUTES AND RULE

Radio Act of 1912, Ch. 287, 37 Stat. 308 ...................................................12

Radio Act of 1927, Ch. 169, 44 Stat. 1162 ...........................................11, 12

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56.............................24

Communications Decency Act of 1996, Pub. L. No. 104-104, 110 Stat. 133 ..............................28

Broadcast Decency Enforcement Act of 2005, Pub. L. No. 109-235, 120 Stat. 491 (2006).....8, 29

18 U.S.C. § 1343...........................................................................12
*18 U.S.C. § 1464.................................................................. *passim*
18 U.S.C. § 1468...........................................................................12

47 U.S.C. § 312 ................................................................................................8, 9

47 U.S.C. § 326 ...................................................................................................20

*47 U.S.C. § 503 ..............................................................................................9, 19

47 U.S.C. § 504(a) .............................................................................................2, 5

47 C.F.R. § 73.3999 .........................................................................................9, 10

## ADMINISTRATIVE DECISIONS

*Complaint Against Various Broadcast Licensees Regarding Their Airing Of The UPN
Network Program "Buffy the Vampire Slayer" on November 20, 2001*,
19 FCC Rcd. 15995 (2004) ...............................................................................17

*Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television
Network Program "Married By America"*,
Forfeiture Order, 23 FCC Rcd. 3222 (2008) ........................................................ passim

*Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television
Network Program "Married By America"*,
Notice of Apparent Liability, 19 FCC Rcd. 20191 (2004) ....................................4, 21

*Complaints Against Various Television Licensees Concerning Their December 31, 2004
Broadcast of the Program "Without A Trace"*,
Notice of Apparent Liability for Forfeiture, 21 FCC Rcd. 2732 (2006)..........................5

*Complaints Against Various Television Licensees Concerning Their February 1, 2004
Broadcast of the Super Bowl XXXVIII Halftime Show*,
Forfeiture Order, 21 FCC Rcd. 2760 (2006).........................................................5, 10

*Complaints Against Various Television Licensees Concerning Their February 1, 2004
Broadcast of the Super Bowl XXXVIII Halftime Show*,
Order on Reconsideration, 21 FCC Rcd. 6653 (2006)..................................................22

*Complaints Against Various Television Licensees Concerning Their February 25, 2003
Broadcast of the Program "NYPD Blue"*,
Forfeiture Order, 23 FCC Rcd. 3147 (2008).........................................................4, 16

*Complaints Against Various Television Station Licensees Regarding the ABC Television
Network's November 15, 2004, Broadcast of "Monday Night Football"*,
20 FCC Rcd. 5481 (2005) ...............................................................................17

*Complaints By Parents Television Council Against Various Broadcast Licensees
Regarding Their Airing of Allegedly Indecent Material*,
20 FCC Rcd. 1920 (2005) ...............................................................................16

*Complaints Regarding Various Television Broadcasts Between February 2, 2002 and
March 8, 2005*, Notices of Apparent Liability and Memorandum Opinion and Order,
21 FCC Rcd. 2664 (2006) ..........................................................................4, 16, 17

*Eastern Educ. Radio,*
24 F.C.C.2d 408 (1970) ...........................................................................21

*Fox Television Stations, Inc.,*
20 FCC Rcd. 4800 (2005) .........................................................................18

*Implementation of Section 551 of the Telecommunications Act of 1996,*
13 FCC Rcd. 8232 (1998) ....................................................................24, 26

*Infinity Broadcasting Corporation of Pennsylvania,*
3 FCC Rcd. 930 (1987) .......................................................................14, 18

*Infinity Broadcasting Corporation of Pennsylvania,*
2 FCC Rcd. 2705 (1987) ...........................................................................18

*\*Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and*
*Enforcement Policies Regarding Broadcast Indecency,*
16 FCC Rcd. 7999 (2001) ................................................................ *passim*

*KSAZ License, Inc.,*
19 FCC Rcd. 15999 (2004) ........................................................................16

*Technical Requirements To Enable Blocking of Video Programming Based on Program*
*Ratings,*
13 FCC Rcd. 11248 (1998) .........................................................................24

*WPBN/WTOM License Subsidiary, Inc.,*
15 FCC Rcd. 1838 (2000) ..........................................................................32

## OTHER AUTHORITIES

FCC, V-Chip:  Viewing Television Responsibly (July 8, 2003), *available at*
www.fcc.gov/vchip ....................................................................................24

Fox Broad. Co. Opp. to Notice of Apparent Liability for Forfeiture (Dec. 3, 2004) ..............14, 27

Patrick Commc'ns, *Broadcasting & Cable Yearbook 2007* (2006) ...........................................24

Webster's New Int'l Dictionary 1211 (1910) ...............................................................12

Webster's New Int'l Dictionary (2d ed. 1934) ...........................................................12

*  Authorities upon which we chiefly rely.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>Fox Television Stations, Inc.,<br>    Licensee of Stations KMSP-TV,<br>    WJBK(TV), and WTTG(TV)<br>    5151 Wisconsin Ave. NW<br>    Washington, DC  20016,<br><br>WDAF License, Inc.,<br>    Licensee of Station WDAF-TV<br>    5151 Wisconsin Ave. NW<br>    Washington, DC  20016, and<br><br>TVT License, Inc.,<br>    Licensee of Station WTVT-TV<br>    5151 Wisconsin Ave. NW<br>    Washington, DC  20016,<br><br>    Defendants. | Civil Action No. 1:08-cv-00584-PLF |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Defendants Fox Television Stations Inc., WDAF License Inc., and TVT License Inc. (collectively "Fox") submit this memorandum of points and authorities in support of their motion to dismiss the complaint.

This case represents the latest example of the Federal Communications Commission's ("FCC") expanded efforts, beginning in 2004, to intensify enforcement of the ban on allegedly "indecent" broadcasts under 18 U.S.C. § 1464. *See, e.g., Fox Television Stations, Inc.* v. *FCC*, 489 F.3d 444, 451-54 (2d Cir. 2007) (describing changes to the FCC's enforcement regime).

Here, the FCC issued an order finding Fox liable for broadcasting an allegedly indecent episode of *Married By America*, which aired on April 7, 2003. When the FCC issues such a forfeiture order, "[t]he licensee . . . has the legal right to refuse to pay the fine,"[1] and Congress has given broadcasters an opportunity for a *de novo* determination of their statutory and constitutional rights through a forfeiture collection action such as this one. *See* 47 U.S.C. § 504(a).

The Government's Complaint should be dismissed because it fails to state a claim under § 1464. First, the Complaint fails to allege that Fox knowingly broadcast the material with the understanding that it was indecent (as the First Amendment requires), and instead relies on a more forgiving willfulness standard that does not apply to indecency cases. That is wrong as a matter of law, so the Complaint should be dismissed.

Second, the Government alleges that Fox broadcast indecent *visual images*, but § 1464 prohibits only the "utterance" of indecent "language;" the FCC has chosen to proceed under a statute that, by its plain terms, does not apply to visual images.

Third, even if § 1464 applies, the content of the show as alleged in the Complaint—*i.e.*, suggestive touching without any depiction of actual nudity or sexual activities—is not indecent under FCC precedents. In fact, the FCC has held numerous similar shows not to be indecent.

Fourth, in order to comply with the First Amendment, the FCC has adopted a long-held policy that it only will initiate enforcement actions and issue forfeiture orders where it has received *bona fide* complaints from viewers who actually watched the show. Because the Complaint does not allege that anyone who actually watched the show complained to the FCC, prosecution of this collection action violates the First Amendment and must be dismissed.

---

[1] *See Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 FCC Rcd. 7999, ¶ 29 (2001) ("*Indecency Policy Statement*").

The Government's claims are also barred by the First Amendment for four additional reasons. First, the Supreme Court in recent years has held repeatedly that it is unconstitutional to ban speech at its source if there is a technology that would permit individual users to block the speech in their homes. *United States* v. *Playboy Ent'mt Group*, 529 U.S. 803 (2000); *Ashcroft* v. *ACLU*, 542 U.S. 656 (2004). Today, the "V-Chip" allows parents and other television viewers to block objectionable programming, and as a result there is no longer any constitutional justification for a direct ban on indecent broadcasts. Second, the FCC's definition of "indecency" is unconstitutionally vague. In *Reno* v. *ACLU*, 521 U.S. 844, 879 (1997), the Supreme Court unanimously struck down an almost identical definition in the Communications Decency Act as unconstitutional under the First Amendment. Third, several recent Supreme Court cases make clear that the Government bears the burden of proving that there is a compelling government interest for its content-based regulation of speech. Here, the Complaint contains no allegation that there is a compelling government interest in banning the suggestive content (with no depiction of actual nudity or sexual activities) described in the Complaint. Finally, the FCC's indecency regime relies on impermissible, subjective value judgments about what speech is in the "public interest," but the First Amendment case law (including the Supreme Court's decision in *FCC* v. *Pacifica*, 438 U.S. 726 (1978)) squarely prohibits the government from distinguishing one show from another on such a basis.

## BACKGROUND

*Married By America* was a short-lived, 2003 reality television series. The premise of the program was that viewers would be given a chance to vote on the contestants' prospective spouses. With the help of relationship experts, family members and friends, the contestants were winnowed down over several, weekly episodes. By the sixth and penultimate episode, only two couples remained, and the episode in question showed those couples choosing wedding dresses

and tuxedoes and conducting wedding rehearsals.  The audience was given the chance to vote on which couple was most likely to have a successful marriage. The couple that won the audience vote was eligible for a prize worth up to $500,000.  Producers filmed, edited and compiled these episodes on an extremely time-constrained schedule, so that the viewing audience could concurrently evaluate the couples' compatibility and relationships.  Like many reality programs, information about future episodes was closely guarded; for example, the April 7, 2003 episode was transmitted to individual stations "precisely at the moment it was scheduled to air."[2]

In October 2004, eighteen months after the series concluded, the FCC issued a Notice of Apparent Liability for Forfeiture for alleged broadcast indecency violations during that episode. *See Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television Network Program "Married By America"*, Notice of Apparent Liability, 19 FCC Rcd. 20191 (2004) ("*Married By America NAL*" or "Notice of Apparent Liability").  The Notice of Apparent Liability focused on a six-minute segment of the episode that featured carefully edited scenes from the contestants' bachelor and bachelorette parties in Las Vegas.  In the Notice of Apparent Liability, the FCC proposed fining all 169 Fox Television Network stations $7000 each, for a total forfeiture of $1,183,000.  Fox and its affiliates filed timely responses, and the FCC took no further action for almost three and a half years.[3]  On February 22, 2008—six weeks before the

---

[2] *See Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television Network Program "Married By America"*, Forfeiture Order, 23 FCC Rcd. 3222, ¶ 19 (2008) ("*Forfeiture Order*") (internal quotation marks omitted).

[3] During this long delay—when no judicial review of the *Married By America NAL* was possible—the FCC frequently cited the Notice of Apparent Liability as precedent in other indecency proceedings against other broadcasts.  *See, e.g.*, *Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, Notices of Apparent Liability and Memorandum Opinion and Order, 21 FCC Rcd. 2664, ¶¶ 24 & n.40, 36, 47, 63, 67 & n.101, 223 & n.283 (2006) ("*2006 Omnibus Order*") (citing *Married By America NAL* in connection with indecency findings related to multiple, different broadcasts); *Complaints Against Various Television Licensees Concerning Their February 25, 2003 Broadcast of the*

five-year statute of limitations lapsed—the FCC issued its final Forfeiture Order. *Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television Network Program "Married By America"*, Forfeiture Order, 23 FCC Rcd. 3222 (2008) ("*Forfeiture Order*"). The *Forfeiture Order* concluded that the bachelor and bachelorette party sequences were indecent, but the FCC limited its $7000 forfeitures to those thirteen stations that broadcast in markets from which the FCC believed it had received a viewer complaint about the episode. *See id.* ¶ 1 n.3. The total forfeiture imposed by the FCC amounted to $91,000.

Fox refused to pay the forfeitures related to its five owned-and-operated broadcast stations in Detroit, Minneapolis, Kansas City, Tampa, and Washington, DC. On April 4, 2008— the next-to-last business day before the statute of limitations lapsed—the Government filed this collection action pursuant to 47 U.S.C. § 504(a).

## ARGUMENT

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson* v. *Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam); *see also Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007); *Summit Health, Ltd.* v. *Pinhas*, 500 U.S. 322, 325 (1991). Although the complaint is to be construed in plaintiff's favor, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts; nor must the Court accept plaintiff's legal

---

*Program "NYPD Blue"*, Forfeiture Order, 23 FCC Rcd. 3147, ¶ 52 (2008) (citing *Married By America NAL*); *Complaints Against Various Television Licensees Concerning Their December 31, 2004 Broadcast of the Program "Without A Trace"*, Notice of Apparent Liability for Forfeiture, 21 FCC Rcd. 2732, ¶ 13 (2006) (citing *Married By America NAL*); *Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, Forfeiture Order, 21 FCC Rcd. 2760, ¶ 7 & n.26 (2006) (citing *Married By America NAL*).

conclusions. *See Kowal* v. *MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Browning* v. *Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER 18 U.S.C § 1464.

The Complaint in this case fails to state a claim for several different reasons: (1) the Complaint fails to allege the requisite *scienter* for a violation of § 1464; (2) the claim of liability rests entirely on a statute which, by its plain language, does not reach the content of the broadcast at issue; (3) the broadcast at issue does not fall within the legal definition of "indecent"; and (4) the government has failed to allege that it received any *bona fide* complaints from viewers.

### A.    The Complaint Fails to Allege the *Scienter* Required to Violate § 1464.

The Government's Complaint should be dismissed because it does not allege that Fox broadcast *Married By America* with the requisite mental state. In order to plead a violation of § 1464, the government must allege that Fox knowingly broadcast the allegedly indecent images with the understanding that those images were indecent. No such allegation is present. Instead, the government alleges only that Fox's broadcast of the images was "willful" within the meaning of 47 U.S.C. § 312(f)—an allegation that means nothing more than that Fox intended to broadcast the show. *See* Complaint ¶¶ 36-39 ("Defendants acted willfully because they consciously and deliberately broadcast the April 7, 2003 episode").

Although § 1464 does not specify its required mental state, that statute is a criminal provision, and *scienter* is presumed to be an element of the violation.[4] *See United States* v. *X-Citement Video, Inc.*, 513 U.S. 64, 69-70 (1994) (invoking the "presumption[] that some form of

---

[4] The statute reads, "[W]hoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years or both." 18 U.S.C. § 1464.

*scienter* is to be implied in a criminal statute," including statutes that are silent regarding *mens rea*); *Staples* v. *United States*, 511 U.S. 600, 606 (1994) ("[O]ffenses that require no *mens rea* generally are disfavored."). The Supreme Court has made clear that "the presumption in favor of a *scienter* requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct," *X-Citement Video*, 513 U.S. at 72, a requirement that has been applied in the § 1464 context.[5] Courts have long held that a broadcaster cannot be held to violate § 1464 unless it acts with *scienter*, specifically with respect to the allegedly offensive material. *See United States* v. *Smith*, 467 F.2d 1126, 1128 (7th Cir. 1972) (reversing a § 1464 conviction where the jury was not instructed "on the necessity of finding *scienter* as an essential element"); *Tallman* v. *United States*, 465 F.2d 282, 285 (7th Cir. 1972) (holding in a § 1464 prosecution that "scienter is an ingredient of the crime charged here"); *Gagliardo* v. *United States*, 366 F.2d 720, 724 (9th Cir. 1966) (holding that "the defendant's intent is a very pertinent and necessary element in a conviction for use of obscenity").

Moreover, the First Amendment requires any statute penalizing expression to contain a *scienter* requirement. In the absence of such a *mens rea* requirement, penal statutes that limit speech violate the First Amendment because they have "the collateral effect of inhibiting the freedom of expression, by making the individual more reluctant to exercise it." *Smith* v. *California*, 361 U.S. 147, 151 (1959).[6] This principle applies equally to monetary penalties— especially the Communications Act's potential multimillion dollar forfeitures for a single

---

[5] *See United States* v. *Smith*, 467 F.2d 1126, 1129 (7th Cir. 1972) ("[I]t would be error to omit a charge that defendant must have knowledge of the contents of his utterances.").

[6] *See also Mishkin* v. *New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of *scienter* to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity."); *New York* v. *Ferber*, 458 U.S. 747, 765 (1982) (noting that, with child pornography laws, "[a]s with obscenity laws, criminal responsibility may not be imposed without some element of *scienter* on the part of the defendant").

utterance.  *See, e.g., Manual Enters., Inc.* v. *Day*, 370 U.S. 478, 492-93 (1962) ("a substantial constitutional question would arise were we to construe [the statute] as not requiring proof of *scienter* in civil proceedings"); *Video Software Dealers Ass'n* v. *Webster*, 968 F.2d 684, 690 (8th Cir. 1992).  *See also Arab-American Anti-Discrimination Comm.* v. *City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005); *Whitton* v. *City of Gladstone*, 54 F.3d 1400, 1410 & n.16 (8th Cir. 1995).[7]

In this case, the only allegation of *mens rea* is the claim that the Fox "willfully" broadcast the episode at issue.  Complaint ¶ 39.  As support for this legal standard, the Complaint cites only 47 U.S.C. § 312(f)(1), which defines "willful" to mean "the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any provision of this [Act] or any rule or regulation of the Commission."  *See* Complaint ¶ 37.  In relying on the willfulness standard of § 312(f)(1), the government asserts that broadcasters are subject to strict liability as to the "indecency" element of § 1464.  In other words, the Complaint alleges that Fox is liable under § 1464 merely because it "consciously and deliberately" broadcast the program, regardless of whether Fox knew the content was indecent.  *See* Complaint ¶ 39 ("Defendants acted willfully because they consciously and deliberately broadcast the April 7, 2003 episode.").

That allegation does not state a claim.  At the outset, § 312(f) does not apply to this action.  Instead, it applies only to FCC proceedings involving either the revocation of a license or construction permit, or a cease and desist order.  *See* 47 U.S.C. § 312(f) (defining the term

---

[7] Since the time of the broadcast at issue, the potential forfeiture for a single violation increased to $325,000 per occurrence, meaning that a single Fox network broadcast potentially could result in a fine of roughly $55 million, if every station affiliated with the network were to receive the maximum fine.  Broadcast Decency Enforcement Act of 2005, Pub. L. No. 109-235, 120 Stat. 491 (2006).

"willful" "for purposes of *this section*," which governs the revocation of a license or construction permit or cease and desist orders) (emphasis added).

Moreover, even in the context of license revocations, § 312's minimal *mens rea* standard does not apply to revocations based upon indecency violations. Sections 312(a)(3), (a)(4), and (a)(7) all apply to "willful" violations of various other rules and provisions, but § 312(a)(6)—which is the provision that applies to indecency violations under 18 U.S.C. § 1464—specifically omits the "willfulness" element. *Compare* 47 U.S.C. § 312(a)(4) ("for *willful* or repeated violation . . . ") (emphasis added) *with* § 312(a)(6) ("for violation of section . . . 1464 of Title 18"). This difference is not accidental: Congress intended that § 1464—a criminal statute implicating free speech rights—have a higher standard of *scienter*.

The provision that *does* apply to collection actions—47 U.S.C. § 503—reflects the same, carefully observed distinction. Sections 503(b)(1)(A) and (B) authorize forfeitures for "willful" violations of certain license requirements, provisions of the Communications Act, and FCC rules.[8] Section 503(b)(4), however, separately authorizes forfeitures for "violations" of § 1464, and it does not include the willfulness element. This again reflects Congress's intent that the "willfulness" standard not be applied to alleged violations of § 1464. *See also FCC* v. *Pacifica Found.*, 438 U.S. 726, 739 n.13 (1978) ("[t]he statutes authorizing civil penalties incorporate § 1464, a criminal statute," citing the predecessor of 47 U.S.C. § 503(b)(1)(D)).

The FCC recently has tried to argue that it has readopted the substance of § 1464 as an administrative rule, 47 C.F.R. § 73.3999, and that as a result it may punish indecency under the

---

[8] The FCC has interpreted the "willful" standard in Section 503(b) to be the same as that in Section 312, even though § 312(f) by its terms applies only to proceedings under § 312.

lower *mens rea* requirements applicable to violations of FCC rules under § 503(b)(1)(B).[9]  This argument attempts to elevate form over substance.  First, § 73.3999 of the FCC's rules is not a substantive prohibition.  That rule, which is entitled "Enforcement of 18 U.S.C. 1464," was promulgated in response to a D.C. Circuit decision requiring a rule to establish a safe harbor for indecent broadcasts between 10:00 p.m. and 6:00 a.m.[10]  Second, Congress clearly placed forfeitures for § 1464 violations (requiring *scienter*) and forfeitures for violations of administrative rules (requiring only "willful" conduct) into separate statutory provisions in § 503(b)(1) for a reason.  If the FCC could evade that congressional distinction simply by re-adopting § 1464 as an agency rule, it would impermissibly render that statutory distinction meaningless.  *TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001) (citing the "cardinal principle" of statutory construction that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant").  Third, even if the FCC could undo the congressional distinctions regarding the relevant *scienter* requirements, the First Amendment still would require *scienter* for a violation of § 73.3999 just as much as it requires *scienter* for a violation of § 1464 because, even on the FCC's theory, § 73.3999 contains the same substantive restriction on freedom of expression.  *See Manual Enters.*, 370 U.S. at 492-93; *X-Citement Video*, 513 U.S. at 71.

Because the Complaint fails to allege that the Fox acted with the *scienter* necessary to violate 18 U.S.C. § 1464, the Complaint should be dismissed.

---

[9] *See, e.g., Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 FCC Rcd. 2760, ¶ 15 (2006) (CBS acted willfully because it "consciously and deliberately broadcast the halftime show, whether or not it intended to broadcast nudity . . .").

[10] *Action for Children's Television* v. *FCC*, 58 F.3d 654, 669-70 (D.C. Cir. 1995) (*en banc*) ("*ACT III*").

**B.    The Plain Language of § 1464 Does Not Prohibit the Broadcast of Allegedly Indecent Images.**

The Complaint also fails to state a claim under the plain terms of 18 U.S.C. § 1464. Section 1464, which is captioned "[b]roadcasting obscene *language*," provides that "[w]hoever *utters* any obscene, indecent, or profane *language* by means of radio communication shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 1464 (emphasis added).  The Complaint does not allege that the broadcast in question featured any "utter[ing]" of "indecent . . . language."  *Id.*  Instead, the Complaint alleges only that the program contained "indecent *material*," Complaint ¶ 21, 23 (emphasis added), which it describes as visual depictions of the bachelor and bachelorette parties.  *See* Complaint ¶¶ 20, 21, 27, 29.  The FCC's effort to broaden the scope of § 1464 to regulate images in addition to language should be rejected.

As with all disputes regarding statutory interpretation, interpreting § 1464 requires this Court to begin with the statute's plain language.[11]  *See Pacifica*, 438 U.S. at 739 (interpreting § 1464 according to "[t]he plain language of the statute").  Section 1464 prohibits broadcasters from using the airwaves to "utter[ ] . . . indecent . . . language," not to transmit indecent pictures. 18 U.S.C. § 1464.  Moreover, dictionary definitions contemporaneous with the statute's enactment confirm this interpretation.[12]  When § 1464 was originally enacted in 1927,[13] dictionaries defined a person who "utters . . . language" as someone who "speak[s]" "words."

---

[11] *See United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1981) ("The task of resolving the dispute over the meaning of [the statute] begins where all such inquiries must begin: with the language of the statute itself.").

[12] *See MCI Telecomms. Corp.* v. *AT&T Co.*, 512 U.S. 218, 228 (1994) (relying upon definitions of a statutory term from the time of a statute's enactment to determine its meaning); *Perrin* v. *United States*, 444 U.S. 37, 42-45 (1979) (looking to ordinary meaning at the time Congress enacted the statute).

[13] *See* Radio Act of 1927, Ch. 169, § 29, 44 Stat. 1162, 1172-73.

Indeed, *Webster's New International Dictionary* (1910) defined "language" as "the body of *words* and methods of combining words used and understood by a considerable community."[14]

Moreover, Congress clearly understood that visual images could be transmitted via radio communications, and it knew how to regulate visual images when it intended to do so.[15] In fact, the statute that included the original enactment of § 1464 (the Radio Act of 1927) expressly recognized that visual images could be sent via "radio communication": that term has been defined (since 1927) as any "intelligence, message, signal, power, *pictures*, or communication of any nature."[16] The inclusion of the word "pictures" belies any suggestion that the focus of § 1464 on spoken words was an oversight or a reflection of Congress's thinking about radio, rather than television. That conclusion is further confirmed in 18 U.S.C. § 1468, in which Congress expressly prohibited "utter[ing] any obscene language *or distribut[ing] any obscene matter* by means of cable television or subscription services on television." *Id.* (emphasis added).[17] While the Complaint attempts to use § 1464 to police what it labels "indecent *material*," Complaint ¶¶ 21, 23 (emphasis added), Congress did not use such a broad term.

Accordingly, Congress meant in § 1464 to prohibit broadcasters from using the airwaves to broadcast indecent words. Where, as here, the statutory language permits only one

---

[14] Webster's New Int'l Dictionary 1211 (1910) (emphasis added). Another roughly contemporaneous dictionary, *Webster's New International Dictionary* (2d ed. 1934), continued to define "utter" as "to give public expression to; to speak; pronounce." Webster's New Int'l Dictionary 2809 (2d ed. 1934). "[L]anguage" was defined as "[a]udible, articulate human speech as produced by the action of the tongue and adjacent vocal organs." *Id.* at 1390.

[15] *See, e.g.*, 18 U.S.C. § 1343, the wire fraud statute, which expressly prohibits the transmission of "any writings, signs, signals, *pictures*, or sounds." *Id.* (emphasis added).

[16] Radio Act of 1927, Ch. 169, § 31, 44 Stat. 1173 (emphasis added). The addition of "pictures"—which was roughly contemporaneous with the invention of television—was a change from the Radio Act of 1912. *See* Radio Act of 1912, Ch. 287, § 6, 37 Stat. 308.

[17] *See also MPAA* v. *FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) ("Congress has been scrupulously clear when it intends to delegate authority to the FCC to address areas significantly implicating program content.").

interpretation, courts must give effect to that language. *See United States* v. *Ron Pair Enters.*, 489 U.S. at 241 (observing that when "the statute's language is plain, the sole function of the courts is to enforce it according to its terms") (internal quotation marks omitted). But even if the language of § 1464 were ambiguous, the rule of lenity would require that any ambiguity in the statutory terms be resolved in favor of Fox.[18] In fact, to the extent there is any ambiguity, the Complaint should be dismissed because Fox's interpretation of § 1464 is—at a minimum—one of the rational readings of the statute.[19] The rule of lenity is particularly applicable in this context, where the FCC's indecency regulations implicate fundamental First Amendment rights.[20]

Because the broadcast images in question are not within the scope of the FCC's authority under 18 U.S.C. § 1464, the Complaint should be dismissed.

### C.    Even if § 1464 Reaches Visual Images, the Broadcast in Question Was Not Indecent, as a Matter of Law, Under the Established Scope of the FCC's Indecency Enforcement Regime.

In this *de novo* action, the Court should make "a fresh, independent determination" as to whether the broadcasts at issue violated § 1464. *See Doe* v. *United States*, 821 F.2d 694, 697-98

---

[18] *Scheidler* v. *Nat'l Organization for Women, Inc.*, 537 U.S. 393, 408 (2003) ("[T]his being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity.") (internal quotation marks and citation omitted); *Cleveland* v. *United States*, 531 U.S. 12, 25 (2000) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.") (internal quotation marks omitted).

[19] *See McNally* v. *United States*, 483 U.S. 350, 359-60 (1987) ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."); *United States* v. *Bass*, 404 U.S. 336, 348 (1971) ("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.") (internal quotation marks omitted).

[20] *See Pacifica*, 438 U.S. at 761 n.4 (Powell, J., concurring) (emphasizing the need for a cautious enforcement approach in order to avoid a "chilling" effect on broadcasters' First Amendment rights); *Action for Children's Television* v. *FCC*, 852 F.2d 1332, 1340 n.14 (D.C. Cir. 1988) ("*ACT I*") (same).

(D.C. Cir. 1987). In substance, the FCC asserts that the broadcast in question depicted people "straddling" one another or touching, but it does not allege that the broadcast displayed any actual sexual activity. In fact, the Complaint makes clear that any nudity was blocked from view by pixilation. Complaint ¶ 21.[21] No court ever has held that § 1464's ban on indecency could be stretched so far, and the FCC repeatedly has held that similar shows are *not* indecent. Accordingly, the Complaint fails to state a claim under § 1464.

At the outset, all the courts to consider the issue have held that the statutory ban on indecency has a limited scope—*i.e.*, graphic and shocking material just short of obscenity. *See, e.g., Sable Commc'ns of Cal., Inc.* v. *FCC*, 492 U.S. 115, 127 (1989) (*Pacifica* was "an emphatically narrow holding"). In *Pacifica*, the Supreme Court emphasized that the FCC did not have broad enforcement authority to reach matters far beyond the "verbal shock treatment" associated with the 12-minute barrage of expletives in that matter. *See Pacifica*, 438 U.S. at 757 (Powell, J., concurring).[22] Indeed, Justices Powell and Blackmun, as part of the 5-4 majority, stressed that the FCC does not have "unrestricted license to decide what speech . . . may be

---

[21] The relevant episode of *Married By America* was rated "TV-14 DLS," indicating that it contained themes and content that many parents would find objectionable for children under age fourteen, including suggestive dialogue ("D"), language ("L") and sexual situations ("S"). *See* Fox Broad. Co. Opp. to Notice of Apparent Liability for Forfeiture 2, 18-19 & n.65 (Dec. 3, 2004), *available at* http://www.fcc.gov/eb/broadcast/Pleadings/Fox_Broadcasting_Company.pdf. It also included an audio and visual disclaimer at the beginning of the program, warning that, "[d]ue to some sexual content, parental discretion" is advised. *Id. See infra* Section II.A (discussing less restrictive alternatives).

[22] *See Pacifica*, 438 U.S. at 742 ("our review is limited to the question whether the Commission has the authority to proscribe this particular broadcast" in a "specific factual context"); *id*. at 750 (plurality opinion) ("[i]t is appropriate . . . to emphasize the narrowness of our holding").

banned from the airwaves in order to protect unwilling adults from momentary exposure to it in their homes." *Id*. at 759-60.[23]

In *Action for Children's Television* v. *FCC*, 852 F.2d 1332 (D.C. Cir. 1988) ("*ACT I*"), the D.C. Circuit emphasized the limits of FCC authority under *Pacifica*, noting that "the FCC has assured this Court . . . that it will continue to give weight to reasonable licensee judgments when deciding whether to impose sanctions in a particular case." *Id.* at 1340 n.14 (D.C. Cir. 1988). The court held that "the potentially chilling effect of the FCC's generic definition of indecency will be tempered by the Commission's restrained enforcement policy." *Id*. Here, the allegations of suggestive touching fall far short *Pacifica*'s "verbal shock treatment" standard and are inconsistent with a restrained approach to indecency enforcement. No court has ever endorsed the Complaint's extremely broad reading of § 1464.

Moreover, there is no precedent for a finding of liability under § 1464, even under the FCC's recently expansive enforcement policies and precedents. The FCC has defined "indecency" as material that describes or depicts sexual or excretory organs or activities in a manner that is patently offensive under contemporary community standards for the broadcast medium. *Indecency Policy Statement* ¶ 4. In determining whether a broadcast is patently offensive, the FCC considers whether the description or depiction is graphic or explicit, is intended to pander or titillate, or is dwelled on at length or repeated. *Id.* ¶ 10.

The scenes from the bachelor and bachelorette parties in Las Vegas in this case were not "graphic or explicit" because the nudity or "depictions [of] sexual organs" were obscured by pixilation. *Complaint* ¶¶ 20, 21. Until the *Forfeiture Order* here, FCC decisions uniformly held

---

[23] The FCC clearly understood the *Pacifica* decision to be a narrow one, and that their ability to continue regulation in this area was dependent upon a restrained approach to enforcement. *See, e.g., Infinity Broad. Corp. of Pa.*, 3 FCC Rcd. 930 (1987).

that where the allegedly offensive material is not visible to the viewers, it is not legally indecent. In 2005, for example, the FCC found that a broadcast of the *Austin Powers* movie, in which a male and a female character appear naked but with their genitals covered by various suggestive objects, was not indecent, in part because the "sexual and/or excretory organs were covered by bedclothes, household objects, or pixilation, . . . and none of the material cited in the complaints actually depicted sexual or excretory organs."[24]  A scene from the television program *Will & Grace* that involved what the FCC described as "dry humping," which the FCC defined as "two people rubbing their clothed bodies together for sexual stimulation," was not deemed indecent because of the absence of any overt depiction of sexual activities.[25]  And, the FCC has rejected an indecency finding with respect to another television program even though the program "suggest[ed] that one character is touching another's sexual organs," because "the apparent touching takes place off-camera; there is never any nudity, depiction of a sexual organ, or depiction of sexual organs or activities.  Rather, viewers are left to surmise what is happening by one character's reactions to another."[26]

Similarly, in applying the test for whether material is "patently offensive," FCC precedent makes clear that whether a broadcast is "graphic and explicit" is based on "whether the visual depiction of the sexual or excretory organ is clear and unmistakable," as opposed to situations where the sexual organs are "pixilated or obscured."[27]  For that reason, the FCC found that a "sexually suggestive" segment of *Monday Night Football* was not graphic or explicit

---

[24]  *See Complaints By Parents Television Council Against Various Broadcast Licensees Regarding Their Airing of Allegedly Indecent Material*, 20 FCC Rcd. 1920, ¶ 9 (2005).

[25]  *KSAZ License, Inc.*, 19 FCC Rcd. 15999, ¶ 1, n.3 (2004).

[26]  *2006 Omnibus Order* ¶ 162.

[27]  *Complaints Against Various Television Licensees Concerning Their February 25, 2003 Broadcast of the Program "NYPD Blue"*, 23 FCC Rcd. 3147, ¶ 13 (2008).

because "with the exception of a moment when her bare back is exposed to the audience, [the character] is at all times fully covered with a towel.  No sexual or excretory organs are shown or described…."[28]  Likewise, the FCC has found that a depiction in another program of characters "in bed passionately kissing, caressing and rubbing against each other" was not indecent because the episode in question did not "depict sexual or excretory organs and [did] not depict sexual activities in a graphic or explicit way. . . . While viewers see the characters kissing, caressing, and rubbing, it is not clear whether the characters are engaged in sexual intercourse."[29]  Under these precedents it is clear that the Complaint does not describe anything in the broadcast in question that displays sexual or excretory organs or activities in a manner that is patently offensive.[30]

Under the same precedents, the broadcast in question could not, as a matter of law, be deemed to be pandering or titillating.  For example, the FCC held that a scene in *Buffy the Vampire Slayer* in which characters were depicted fighting one another before engaging in sexual intercourse was not "calculated to pander to, titillate or shock the audience" because the

---

[28] *See Complaints Against Various Television Station Licensees Regarding the ABC Television Network's November 15, 2004, Broadcast of "Monday Night Football"*, 20 FCC Rcd. 5481, ¶ 8 (2005).

[29] *2006 Omnibus Order* ¶¶ 148, 149.

[30] *Cf. United States* v. *Williams*, No. 06-694, slip op. at 10 (U.S. May 19, 2008) (approving statutory definition of "sexually explicit conduct" that was limited to "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals").

depiction was not "sufficiently graphic or explicit."[31]  In addition, the disputed scene in *Married By America*—one six-minute segment in one hour-long episode —was not repeated.[32]

The *Married By America* broadcast cannot, as a matter of law, be distinguished from these numerous other broadcasts that the FCC has held were not indecent.  Although there may have been "sexually suggestive" material that may have been offensive to some,[33] nothing alleged in the Complaint would constitute indecency as it has been defined by the FCC to date.  Indeed, if the FCC has the authority to punish broadcasts as "indecent" in circumstances involving no actual nudity or depiction of sexual activity,[34] then a broad range of what is broadcast on television today is subject to sanction at the whim of the FCC.  As a matter of law, the *Married By America* episode, even as described in the Complaint, is not indecent.[35]

---

[31] *Complaint Against Various Broadcast Licensees Regarding Their Airing Of The UPN Network Program "Buffy the Vampire Slayer" on November 20, 2001*, 19 FCC Rcd. 15995, ¶ 6 (2004).  *See also 2006 Omnibus Order* ¶ 229 (finding no titillation or pandering in an arguably inappropriate display by an athlete where no body parts were exposed).

[32] *See, e.g., 2006 Omnibus Order* ¶ 185 (finding that the disputed advertisement is not repeated or dwelled upon when the broadcast "moves on" from anything arguably indecent to the rest of the ad).

[33] "The Commission has consistently said that it 'will not—indeed, cannot—have licensees abandon program material because it is offensive to some or even a substantial number of listeners.'"  *Infinity Broad. Corp. of Pa.*, 2 FCC Rcd. 2705, ¶ 6 (1987) (citing *Sonderling Broad. Corp.*, 41 F.C.C.2d 777, 784 (1973)).  *See also Infinity Broad. Corp. of Pa.*, 3 FCC Rcd. 930, ¶ 10 (1987) ("Provocative programming will inevitably offend some listeners or viewers, but we must always be mindful of the first amendment limitations on the government's ability to regulate the content of speech.").

[34] *See Forfeiture Order* ¶ 12 (sexual organs were pixilated and "the scenes were carefully edited so that the camera cut away" before certain behaviors).  Indeed, if pixilation is insufficient to obscure naked sexual organs because everyone knows what is under the pixilation, and careful editing to avoid depiction of sexual activities is insufficient because everyone knows what was about to happen, it is difficult to conceptualize the bounds of the FCC's indecency authority.

[35] The FCC also has found programs that contained multiple, extended "bleeps" over language assumed to be offensive were not indecent because "the material is not patently offensive, as defined by Commission precedent, because the cited dialogue is neither sufficiently graphic nor explicit. . . . [V]irtually all of the language to which [the complainant] objects was edited from the program prior to broadcast, so that it is not decipherable by viewers."  *Fox Television*

**D.**     **The FCC Did Not Receive a Single Facially Sufficient Complaint.**

The Complaint also should be dismissed because it does not allege that the FCC received any complaints about the episode from any members of the public who actually watched the episode at issue.  *See* Complaint ¶ 21.  In this context, the First Amendment, the statute and the FCC's repeated commitments to act with restraint all limit the FCC's authority over allegedly indecent broadcasts to only those circumstances in which it has received *bona fide* viewer complaints.[36]     Because the FCC did not follow its constitutionally required restrained enforcement policy, the Complaint's failure to allege that the underlying *Forfeiture Order* was based on *bona fide* viewer complaints requires dismissal.

The courts repeatedly have made clear that, if the Government has any constitutional authority to regulate "indecency" at all, it must enforce § 1464 with the utmost restraint.  In rejecting a facial constitutional challenge to § 1464 in its original *Pacifica* decision, the concurring Justices emphasized that they were affirming the FCC's order *only* because "the Commission may be expected to proceed cautiously, as it has in the past."  *Pacifica*, 438 U.S. at 756, 760, 761 n.4 (Powell, J., concurring).  The D.C. Circuit has subsequently emphasized Justice Powell's "expectation that the Commission will continue to proceed cautiously" and has rejected an overbreadth challenge to the agency's indecency regime solely because it believed that "the potential chilling effect of the FCC's generic definition . . . will be tempered by the Commission's restrained enforcement policy."  *ACT I*, 852 F.2d at 1340 n.14.  In other words,

---

*Stations, Inc.*, 20 FCC Rcd. 4800, ¶ 8 (2005).  There is no reason why obscured images (assuming that § 1464 applies to visual images at all, *see supra*) should be treated any differently than obscured language.  From the perspective of the audience (and particularly children), if the message is edited in such a way as to make it unclear to the recipient, it simply cannot be considered explicit or graphic.

[36] Almost all of the underlying complaints at issue here were drafted by the Parents Television Council and forwarded verbatim by supporters of that group without any assertions that the complainants had actually seen the program.

every court that has considered § 1464 and the FCC's enforcement authority has recognized that the ban on "indecency" raises profound constitutional questions. The courts have upheld the FCC's authority only because of FCC promises to act with restraint by interpreting § 1464 (and the FCC's authority under § 503) as narrowly as possible.

Since *Pacifica*, a core element of the FCC's restraint has been its policy that it will initiate enforcement actions only in response to *bona fide* viewer complaints. In recognition of the limits on its authority, the FCC issued a "policy statement" in 2001 and explained that it "does not independently monitor broadcasts for indecent material." *Indecency Policy Statement* ¶ 24.[37] Rather, its "enforcement actions are based on documented complaints of indecent broadcasting received from the public." *Id.* Moreover, at the time *Married By America* aired, the FCC's policy was that it would not even consider a complaint unless it contained, *inter alia*, the "date and time of the broadcast" and the "call sign of the station involved." *Id.* The FCC explained that if a complaint "does not contain the supporting material described above," the complaint is "usually dismissed by a letter to the complainant advising of the deficiency." *Id.* ¶ 25.

This enforcement principle—that the FCC should respond only to *bona fide* viewer complaints—is both implicit in the statutory scheme and critical to the constitutionality of the FCC's regulation of indecency. To the extent the FCC asserts authority to regulate the content of

---

[37] The FCC issued its policy statement as part of a settlement of yet another constitutional challenge to the indecency regime in *United States* v. *Evergreen Media Corp.*, Civ. No. 92 C 5600 (N.D. Ill. 1994); *see Indecency Policy Statement* ¶ 30 n.23. The FCC explained that "[t]he FCC's enforcement policy under Section 1464 has been shaped by a number of judicial and legislative decisions," that "indecent speech is protected by the First Amendment and thus the government must both identify a compelling interest for any regulation it may impose on indecent speech and choose the least restrictive means to further that interest," and that the enforcement policies described in the policy statement were intended to further these interests. *Id.* ¶¶ 3-5.

broadcasts on its own initiative, such a claim would raise serious statutory and constitutional issues.    Section 326 of the Communications Act prohibits the FCC from engaging in censorship,[38] and the FCC has previously recognized that § 1464 "does not mean . . . that the Commission could properly assess program after program, stating that one was consistent with the public interest and another was not.  That would be flagrant censorship."  *Eastern Educ. Radio*, 24 F.C.C.2d 408, 413 (1970); *see also Pacifica*, 438 U.S. at 759-60 (Powell, J., concurring).   In addition, the FCC purports to be enforcing a (still ill-defined) "community standard for the broadcast medium."  *See, e.g., Forfeiture Order* ¶ 12.  If the FCC were to begin issuing forfeitures in the absence of any *bona fide* viewer complaints, such a system would be contrary to the First Amendment, as well as FCC policies and repeated FCC promises to the courts to act with restraint.

Here, the Complaint is deficient on its face because it does not allege that the FCC received complaints about these broadcasts from persons that actually watched the show when it was broadcast.[39]  There is no allegation that a single person in Washington, Minneapolis, Detroit, Kansas City or Tampa, out of the millions of television viewers in those cities, actually watched this program and was moved to complain to the FCC.  By issuing a forfeiture that is not based on any *bona fide* viewer complaints, the FCC has acted as a self-appointed, roving board of censorship.

---

[38] Section 326 provides: "Nothing in this chapter shall be understood or construed to give the licensing authority the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation shall be promulgated by the licensing authority which shall interfere with the right of free speech by means of radio communications."  47 U.S.C. § 326.

[39] The Complaint states only that "[t]he Commission received complaints that this episode contained indecent material."  Complaint ¶ 21.

Nor can this deficiency be cured with respect to four of the five licensees. In its original NAL, the FCC proposed to fine every single Fox affiliate in the nation that aired the *Married By America* program at issue. *See Married By America NAL* ¶¶ 1, 16.[40] Following a FOIA request, the FCC was forced to reveal that the vast majority of Fox affiliates listed in the NAL had not been the subject of any complaints at all.[41] With respect to the five licensees at issue here, the underlying complaints for four of the licensees (all except TVT License, Inc.) did not contain the information concerning the broadcast required by the FCC's policies (such as the call letters of the station involved) and thus should have been dismissed pursuant to the *Indecency Policy Statement*.[42] The FCC's current approach, in which it simply seeks to match complainants with the licensee in their broadcast area without regard to whether the complainant actually watched the program,[43] is inconsistent with an appropriately restrained enforcement policy and cannot serve as the basis of either a *Forfeiture Order* or a collection action.

---

[40] Indeed, the FCC could not have received complaints against all 169 stations that it proposed to fine in the *Married By America NAL*, because the FCC claimed to have received a total of only 159 complaints regarding the broadcast. *See Married By America NAL* ¶ 2.

[41] In response to the FOIA request, the FCC admitted that it had in fact received only 90 complaints, and that many of these were duplicates, and in fact it only had complaints from 23 different individuals.

[42] Significantly, the non-Tampa complaints were identically worded form complaints generated by the Parents Television Council and forwarded verbatim by these individuals to the FCC in an email or letter, and the complainants did not assert that they actually watched the program at issue. The complaints simply state "Here's just some of what TV viewers, young and old (the show was aired at 9 PM), heard and saw," followed by the identical bullet point list. The complaints state that a video of the program is available from Parents Television Council.

[43] *See, e.g., Complaints Against Various Broad. Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, Order on Reconsideration, 21 FCC Rcd. 6653, ¶ 30 (2006) ("it is sufficient that viewers in markets served by each of the CBS Stations filed complaints with the Commission identifying the allegedly indecent program broadcast by the CBS Stations"); *see also Forfeiture Order* ¶ 1 n.3 (limiting forfeitures to "markets from which we received indecency complaints," without any assertion that complainants in those markets had watched the show).

## II.    THE CLAIMS ASSERTED IN THE COMPLAINT ARE BARRED BY THE FIRST AMENDMENT.

The Complaint's claims are also invalid under the First Amendment for four reasons:  (1) the advent of a blocking technology (the V-chip) has made a direct ban on "indecent" speech unconstitutional; (2) the FCC's definition of "indecency" is unconstitutionally vague; (3) neither the FCC nor any court has ever found a compelling governmental interest in banning the type of programming described in the Complaint; and (4) the FCC's indecency regime impermissibly relies on subjective judgments.

### A.    The FCC's Indecency Policy Is Not Narrowly Tailored to Advance the Asserted Interest in Protecting Children.

Content-based restrictions on speech, such as regulations on "indecency" in broadcast television, are constitutional only if they are "narrowly tailored" to advance a "compelling interest." *ACT III*, 58 F.3d at 659 (quoting *Sable Communications of Cal., Inc.* v. *FCC*, 492 U.S. 115, 126 (1988)); *accord Playboy*, 529 U.S. at 811-12; *Reno* v. *ACLU*, 521 U.S. 844, 879 (1997).[44]  To be "narrowly tailored," the regulation must represent the "least restrictive" means to address the relevant governmental interest.  *Playboy*, 529 U.S. at 811-15.  "[I]f a less restrictive means is available for the Government to achieve its goals, the Government *must* use it."  *Id.* at 815 (emphasis added); *see Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 641-42 (1994); *Pacifica*, 438 U.S. at 748.

Applying these principles, the Supreme Court repeatedly has held that a direct ban on speech is unconstitutional if there is a technology that allows individuals to block the speech in

---

[44] "Indecent" speech, unlike obscenity, is fully protected under the First Amendment, *see Sable*, 492 U.S. at 126, and the FCC has acknowledged that indecency regulations are subject to strict scrutiny.  *Indecency Policy Statement* ¶ 3 ("[T]he government must both identify a compelling interest for any regulation it may impose on indecent speech and choose the least restrictive means to further that interest.").

their homes. For example, in *Playboy*, the Court concluded that, because "[c]able systems have the 'capacity to block unwanted channels on a household-by-household basis,'" the government was not permitted under the First Amendment to impose restrictions on "indecent" cable programming. 529 U.S. at 815. Similarly, in *Ashcroft* v. *ACLU*, 542 U.S. 656 (2004), the Court found that software designed to filter pornographic materials on the Internet represented a more narrowly tailored means, as compared to a statutory ban on such materials, to address the government's interest in safeguarding children from exposure to such material. *Id.* at 666-67. And in *Sable*, 492 U.S. at 128-131, the Court held that technology that scrambled telephonic "dial-a-porn" messages unless the user provided a credit card and access code constituted a less restrictive means to protect children than a total ban of those messages.

For more than a decade, individual television owners have had access to widely available technology that allows them to block objectionable programming. That technology, commonly known as the "V-Chip," is able to decode ratings that are assigned to particular programs. Parents, and others, can set the device to block programming that contains content that the owner would deem offensive. FCC, V-Chip: Viewing Television Responsibly (July 8, 2003), *available at* http://www.fcc.gov/vchip.[45]

---

[45] The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, required the FCC to work with the broadcast and cable industry to develop ratings that would identify programming that contains, inter alia, "indecent" material. *Implementation of Section 551 of the Telecommunications Act of 1996*, 13 FCC Rcd. 8232 (1998) (approving the system). Since January 1, 2000, all new televisions larger than 13 inches have been equipped with the V-Chip. *Technical Requirements To Enable Blocking of Video Programming Based on Program Ratings*, 13 FCC Rcd. 11248 (1998). The vast majority of televisions in use have V-Chip capabilities, and consumers can easily obtain set-top boxes that would add such functionality to older sets. *See* Patrick Commc'ns, *Broadcasting & Cable Yearbook 2007*, at A-12 (2006). By 2009—when broadcasters are scheduled to abandon the analog spectrum and convert to digital broadcasts, and consumers respond by buying television sets capable of displaying digital video—nearly every television set in the United States is likely to have a V-Chip.

The V-Chip is an effective, less speech-restrictive means of addressing the government's interest in protecting children. The government therefore "must use it" instead of pursuing fines for "indecent" television broadcasts. *Playboy*, 529 U.S. at 815. The restrictions on indecency were developed at a time when broadcast programming entered the home without filter, and there was no means of protecting viewers—particularly children—from "unexpected program content" or unwanted exposure to potentially offensive material. *See Pacifica*, 438 U.S. at 748. The V-Chip, however, allows parents to pre-set their televisions to block indecent programming at the point of reception, and as a result there is no longer any constitutionally adequate justification for the FCC's attempt to ban this speech at its source and to prevent the vast majority of willing consumers from viewing it. *Ashcroft* v. *ACLU*, 542 U.S. at 666-67 ("Filters are less restrictive than [complete bans on indecent speech because they] impose selective restrictions on speech at the receiving end, not universal restrictions at the source."); *see also Playboy*, 529 U.S. at 818 ("Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make [content-based] choices for us.").

The Supreme Court has already relied on the V-Chip as a feasible and effective means to restrict access to indecent speech on television. In *Denver Area Educ. Telecomms. Consortium, Inc.* v. *FCC*, 518 U.S. 727 (1995) (plurality opinion), the Court struck down certain statutory "segregate and block" provisions (which required cable operators to segregate "patently offensive" leased access programs on a single channel and block that channel from viewer access unless the viewer gave written notice to the contrary), because blocking the programming entirely was not as "narrowly tailored" as other technological alternatives—including the V-Chip—available to satisfy the government's interest in protecting children. *Id.* at 755-56

("manufacturers, in the future, will have to make television sets with a so called 'V chip'—a device that will be able automatically to identify and block sexually explicit or violent programs").  If the V-Chip was viewed as an effective and less restrictive alternative to the segregate-and-block provisions in *Denver Area*, the technology *must* be viewed as an effective and less restrictive alternative to the ban on indecent content that the Government seeks to enforce in this case.

In recent orders, the FCC has claimed that it cannot rely on the V-Chip to supplant indecency regulation because programs may not always be correctly rated (and some categories of programming, such as sports and live events, are not required to be rated).  *See, e.g., Forfeiture Order* ¶ 36.  These assertions, however, cast no doubt on whether the V-Chip is an effective alternative to a complete ban on protected speech for purposes of the First Amendment.  In § 551 of the Telecommunications Act of 1996, Congress directed the FCC to determine whether the ratings system proposed by the industry constituted a comprehensive method for filtering programs containing violent, sexual, or other indecent material.  The FCC concluded pursuant to this mandate that the proposed system was "acceptable" and "consistent" with congressional objectives.  *Implementation of Section 551 of the Telecommunications Act of 1996*, 13 FCC Rcd. 8232, ¶¶ 2, 33 (1998).  It found that the ratings system met the congressional goal "of achieving an effective method by which the rating system, when used in conjunction with the v-chip technology, will provide parents with useful tools to block programming they believe harmful to their children."  *Id.* ¶¶ 2, 24.  Given the FCC's finding that the ratings system is *effective*, the FCC cannot now argue that the same system is *ineffective*.

But even if the FCC were right that programs occasionally are rated incorrectly, the Supreme Court has made clear that the First Amendment does not demand that an alternative to a speech-restrictive regulation be perfect, or absolutely impervious to assault or evasion:

> It is no response that voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time. A court should not assume a plausible, less restrictive alternative would be ineffective; and *a court should not presume parents, given full information, will fail to act.*

*Playboy*, 529 U.S. at 824 (emphasis added); *see also Sable*, 492 U.S. at 128 (fact that "enterprising youngsters could and would evade the rules and gain access to [indecent] communications" did not establish that rules were ineffective).[46] So long as a less speech-restrictive alternative would be reasonably effective in achieving the government's objectives, that alternative *must* be used. *Ashcroft* v. *ACLU*, 542 U.S. at 666-67. The Government's Complaint—which seeks to enforce a direct ban on protected speech, instead of relying on the less restrictive alternative of the V-Chip—must therefore be dismissed.

### B.    The FCC's Indecency Policy Is Unconstitutionally Vague.

The Complaint also must be dismissed because it seeks to enforce a definition of "indecency" that is unconstitutionally vague. It is well-settled that the government cannot use a vague standard in regulating constitutionally protected speech. *See, e.g.*, *Reno*, 521 U.S. at 874. The FCC's indecency policy bans expression protected by the First Amendment, and the vagueness doctrine therefore "demands a greater degree of specificity than in other contexts." *Smith* v. *Goguen*, 415 U.S. 566, 573 (1974).

---

[46] There is no question that the rating was appropriate in this case. The relevant episode of *Married By America* was rated "TV-14" and "DLS" for suggestive dialogue, coarse language, and sexual situations, *see* Fox Broad. Co. Opp. to Notice of Apparent Liability for Forfeiture 2, 18-19 & n.65, and included a disclaimer at the beginning of the program, warning that, "[d]ue to some sexual content, parental discretion" is advised. *Id.*

No court has ever reached a considered judgment that the FCC's regulation of indecency is not vague. In *Pacifica*, the Supreme Court expressly declined to consider a vagueness challenge to the FCC's regime. 438 U.S. at 742-43. Moreover, the D.C. Circuit, in *ACT I*, acknowledged that "the [Supreme] Court did not address, specifically, whether the FCC's definition was on its face unconstitutionally vague." *ACT I*, 852 F.2d at 1338-39. The D.C. Circuit engaged in no vagueness analysis of the FCC's indecency policy, but merely "infer[red]" that the Supreme Court must have thought the policy was not vague and welcomed correction by "Higher Authority" if it had misunderstood. *Id.*

In the years since *Pacifica* and *ACT I*, however, a unanimous Supreme Court in *Reno* concluded that the indecency standard in the Communications Decency Act of 1996 ("CDA"), Pub. L. No. 104-104, 110 Stat. 133—which is almost word for word identical to the FCC's indecency standard for broadcasting—was unconstitutionally vague. *See Reno*, 521 U.S. at 870-74. The CDA defined indecency as any "communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." *Id.* at 860 (quoting 47 U.S.C. § 223(d)). That is almost identical to the FCC's "indecency" standard: "First, the material alleged to be indecent must fall within the subject matter scope of our indecency definition—*i.e.*, the material must describe or depict sexual or excretory organs or activities. . . . [Second,] the complained-of material [must be] patently offensive as measured by contemporary community standards for the broadcast medium." *Forfeiture Order* ¶¶ 11-12 (citing *Indecency Policy Statement* ¶ 7). In *Reno*, the

Supreme Court squarely held that such a broad restriction on speech is unconstitutional.  521

U.S. at 870.[47]

When confronted with *Reno*, the FCC in recent orders has pointed to a different portion

of that opinion, addressing a different issue, in which the *Reno* Court distinguished *Pacifica*.  *See*

*Forfeiture Order* ¶ 33.  *Reno* was the first case involving the Internet to reach the Supreme

Court, and the Government there attempted to establish the principle that the Internet should be

treated exactly like broadcasting and therefore subject to regulation under *Pacifica.  Reno*, 521

U.S. at 868.  Although the Court rejected that specific argument, *id.* at 868-70, that holding had

nothing to do with the separate question of whether the content-based regulation of speech was

unconstitutionally vague (an issue *Pacifica* did not address with respect to indecent

broadcasting).  Whatever the characteristics of the medium and the appropriate level of First

Amendment scrutiny, vagueness is an independent constitutional doctrine, and no regulation—of

any medium—is permissible if it fails to give speakers adequate notice of what can and cannot

be said.  Because the Supreme Court held that the very terms the FCC uses in its indecency

definition would "unquestionably silence[] some speakers whose messages would be entitled to

constitutional protection," *Reno*, 521 U.S. at 874, the Second Circuit has expressed skepticism

that "the FCC's identically worded indecency test could nevertheless provide the requisite clarity

to withstand constitutional scrutiny."  *Fox Television Stations, Inc.* v. *FCC*, 489 F.3d at 464

(citing *Reno*); *see also id.* ("[W]e are hard pressed to imagine a regime that is more vague.").

---

[47] Numerous courts have since cited *Reno* in striking down laws intended to ban or regulate the
provision of material that may be indecent or harmful to minors.  *See, e.g.*, *Ashcroft* v. *Free
Speech Coalition*, 535 U.S. 234 (2002); *Playboy*, 529 U.S. 803; *PSINet, Inc.* v. *Chapman*, 362
F.3d 227 (4th Cir. 2004); *ACLU* v. *Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656
(2004); *Am. Amuse. Mach. Ass'n* v. *Kendrick*, 244 F.3d 572 (7th Cir. 2001); *ACLU* v. *Johnson*,
194 F.3d 1149 (10th Cir. 1999).

The FCC's "we-know-it-when-we-see-it" standard leaves broadcasters without any guidance to distinguish forbidden content from permissible content, a situation that the First Amendment forbids. *See, e.g.*, *Reno*, 521 U.S. at 871; *Kolender* v. *Lawson*, 461 U.S. 352, 357-58 (1983); *Grayned* v. *Rockford*, 408 U.S. 104, 108-09 (1972); *Gentile* v. *State Bar*, 501 U.S. 1030, 1048 (1991). The Government's vague standard impermissibly chills speech by forcing broadcasters to "steer far wider of the unlawful zone," *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958), and to restrict their expression "to that which is unquestionably safe," *Baggett* v. *Bullitt*, 377 U.S. 360, 372 (1964). Indeed, that chill has grown with enactment of the Broadcast Decency Enforcement Act of 2005, Pub. L. No. 109-235, 120 Stat. 491 (2006), which increased ten-fold the maximum penalties for violations of the FCC's indecency policy, to $325,000 per occurrence (and, under the FCC's practice, per station). *Id.* For all of these reasons, the Supreme Court's decision in *Reno* is dispositive and requires dismissal of this Complaint. *See also Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 59 (1963); *Lewis* v. *New Orleans*, 415 U.S. 130, 134 (1974); *Gooding* v. *Wilson*, 405 U.S. 518, 519 (1972).

### C.    No Court Has Ever Recognized a Compelling Interest in Prohibiting the Type of Broadcast Alleged in the Complaint.

A content-based restriction on speech is valid under the First Amendment only if it advances a "compelling" state interest, addressing a harm that is both "immediate" and "serious." *Gibson* v. *Fla. Legislative Investigation Comm.*, 372 U.S. 539, 550 (1963); *see ACT III*, 58 F.3d at 660. The burden of proving the nature of the harm, for purposes of demonstrating a "compelling" interest, lies squarely on the government. *Ashcroft* v. *Free Speech Coalition*, 535 U.S. at 244-53; *Playboy*, 529 U.S. at 819-23, 825; *FCC* v. *League of Women Voters of Cal.*, 468 U.S. 364, 387-91 (1984). The government must demonstrate that the harm is real, not merely

conjectural or speculative, *see, e.g.*, *Turner*, 512 U.S. at 664, and that the proposed solution will in fact remedy (or at least address) the problem, *see, e.g.*, *Playboy*, 529 U.S. at 819-23, 825.

The Government has failed to sustain this burden. The Complaint is devoid of any allegation that exposure to pixilated and blurred images of the kind that appeared in *Married By America* actually poses any threat to the well-being of children. The *Forfeiture Order* similarly refused to provide any evidence of actual harm from the kind of material broadcast during *Married By America*.

Instead of attempting to provide evidence of harm to children, the FCC simply relies on a passage from *ACT III* in which the D.C. Circuit concluded that "the Supreme Court has never suggested that a scientific demonstration of psychological harm is required in order to establish the constitutionality of measures protecting minors from indecent speech." *ACT III*, 58 F.3d at 661-62. But Supreme Court cases subsequent to *ACT III* have required a more substantial showing of the purported compelling interest for a content-based regulation of speech. "In the absence of a factual basis substantiating the harm and the efficacy of its proposed cure, we cannot assume that the harm exists or that the regulation redresses it." *Denver Area*, 518 U.S. at 766; *see also id.* at 774 (Stevens, J., concurring) (noting that "the Government has made no effort to identify the harm"); *Playboy*, 529 U.S. at 822-23 (faulting the government for failing to show a "pervasive, nationwide problem justifying its nationwide daytime speech ban").

Moreover, *ACT III* addressed indecent content that was materially different from the allegedly indecent pixilated images broadcast in *Married By America*. The *ACT III* court was expressly contemplating the possibility that children would be exposed to "hard core pornography." *ACT III*, 58 F.3d at 660. The government cannot simply rely on *ACT III*'s conclusions regarding the harms associated with hard core pornography in assuming a similar

harm to children from *Married By America*.  *Turner*, 512 U.S. at 664; *see also Edenfield* v. *Fane*, 507 U.S. 761, 770-71 (1993) (requiring government to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," even in a commercial speech case subject to intermediate scrutiny).

The constitutional validity of the forfeitures at issue here depends upon proof of actual harm.  No such harm is alleged in the complaint, and the First Amendment therefore precludes the forfeitures against Fox.

**D.**    **The FCC's Indecency Policy Impermissibly Relies on Subjective Criteria.**

It is a fundamental precept of the First Amendment that the government is not entitled to punish protected speech based on the government's judgment of the social value of the speech. *See Playboy*, 529 U.S. at 818.[48]  Indeed, in *Pacifica*, the concurring justices made clear that "the Justices of this Court are [not] free generally to decide on the basis of its content which speech protected by the First Amendment is most 'valuable' and hence deserving of the most protection, and which is less 'valuable' and hence deserving of less protection."  Rather, they must find support solely in objective criteria, which define with reasonable certainty the boundary between permissible and impermissible speech.  *Id.* at 761 (Powell, J., concurring).

The forfeiture order that the Government seeks to enforce here, however, depends on just such impermissible subjective judgments.  The FCC supported its finding of indecency by claiming that the "theme" of the *Married By America* episode was "tempting engaged couples into sexual dalliances with hired strippers."  *Forfeiture Order* ¶ 15.  It contrasted this with the

---

[48] *See also Pacifica*, 438 U.S. at 761 (Powell, J., concurring); *id.* at 762-63 (Brennan, J., dissenting) (noting *Pacifica* majority had refused "to embrace the notion, completely antithetical to basic First Amendment values, that the degree of protection the First Amendment affords protected speech varies with the social value ascribed to that speech by five Members of this Court.").

movie *Saving Private Ryan*, in which the characters repeatedly use words that have elsewhere been found to be "indecent," on the ground that *Saving Private Ryan* depicts World War II combat soldiers in "unspeakable conditions." *Id.* To put it bluntly, the "indecent" expressions in *Saving Private Ryan* were acceptable to the government because the FCC believed that *Saving Private Ryan* contained a more worthy or morally valid artistic message. The "indecent" images in *Married By America*, by contrast, were unacceptable because the FCC believed that the overall content or "theme" of the programming lacked artistic or moral value. The FCC has made similarly subjective judgments in approving other broadcasts such as *Schindler's List* that, unlike *Married By America*, included images of fully naked people.[49] Even if almost everyone would agree on the artistic or moral judgment inherent in this distinction, such a subjective valuation by the government cannot justify a restraint on speech.

The principle that subjective taste can play no role in the regulation of speech has been made repeatedly and forcefully by the Supreme Court:

> The Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. *What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.* Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make these choices for us.

*Playboy*, 529 U.S. at 818 (emphasis added). There is simply no way to square this statement with the rationale employed by the FCC in distinguishing the content of *Married By America* from *Saving Private Ryan* or *Schindler's List*. The forfeiture order in this case represents

---

[49] *See WPBN/WTOM License Subsidiary, Inc.*, 15 FCC Rcd. 1838 (2000) (finding that scenes in the movie *Schindler's List* in which fully naked men and women are shown from the front and back—without any pixilation or obstruction—were not "indecent").

nothing more than a moral or artistic judgment that some content, messages, or themes are preferable to others.

These sorts of impermissible judgments are an inherent feature of the FCC's current, expanded indecency regime, in which the FCC is no longer restricting itself to clear, egregious examples of indecency but rather is scrutinizing scores of programs for those that the five FCC Commissioners believe to be unacceptable for broadcast. This is an inherently unconstitutional undertaking, because there is no way to distinguish among these broadcasts without relying on highly debatable assertions about the value or message of the program at issue. The FCC cannot cherry-pick among different shows to penalize only those viewpoints with which it disagrees. *Id.*; *see also R.A.V.* v. *St. Paul*, 505 U.S. 377, 391-93 (1991); *cf. Cornelius* v. *NAACP Legal Defense Fund*, 473 U.S. 788, 811-12 (1985) (facially neutral regulation will be found unconstitutional if applied in viewpoint-discriminatory manner). The Government's attempt to enforce these subjective judgments must be dismissed.

## CONCLUSION

For the foregoing reasons, Fox respectfully requests that this Court dismiss the complaint.

Respectfully submitted,


/s/ David S. Petron
R. Clark Wadlow (DC Bar No. 33340)
Mark D. Hopson (DC Bar No. 394338)
James P. Young (DC Bar No. 445476)
David S. Petron (DC Bar No. 486325)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
(202) 736-8000
mhopson@sidley.com
dpetron@sidley.com

June 2, 2008                    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on June 2, 2008, the MEMORANDUM OF POINTS AND AUTHORITIES

IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT was filed

electronically with the Clerk of the Court using CM/ECF, which will send notification that such

filing is available for viewing and downloading to the following counsel or record:


Eric B. Beckenhauer (eric.beckenhauer@usdoj.gov)
Jacqueline Coleman Snead (jacqueline.snead@usdoj.gov)


/s/ David S. Petron
David S. Petron