# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>    **Plaintiff,**<br><br>    v.<br><br>**FOX Television Stations, Inc.,**<br>    **Licensee of Stations KMSP-TV,**<br>    **WJBK(TV), and WTTG(TV)**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC 20016,**<br><br>**WDAF License, Inc.,**<br>    **Licensee of Station WDAF-TV**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC 20016, and**<br><br>**TVT License, Inc.,**<br>    **Licensee of Station WTVT(TV)**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC 20016,**<br><br>    **Defendants.** | Civil Action No. 08-584(PLF)<br><br><br>**PLAINTIFF'S OPPOSITION TO**<br>**DEFENDANTS' MOTION TO**<br>**DISMISS** |

GREGORY G. KATSAS
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD (D.C. Bar No. 459548)
ERIC B. BECKENHAUER (Cal. Bar No. 237526)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W., Room 7214
Washington, D.C. 20530
Tel: (202) 514-3418
Fax: (202) 616-8470

**Attorneys for the United States of America**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. ................................................................................................. ii

INTRODUCTION............................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND. ........................................................ 2

STATEMENT OF FACTS. ................................................................................................. 4

SCOPE OF REVIEW. ....................................................................................................... 8

ARGUMENT. ................................................................................................................... 10

    I.    THE UNITED STATES HAS SUFFICIENTLY PLED VIOLATIONS
        OF 18 U.S.C. § 1464 AND 47 C.F.R. § 73.3999. ................................................. 10

        A.    The Complaint Sufficiently Pleads Scienter. ........................................... 11

        B.    The Complaint Alleges Conduct Within Section 1464's
            Prohibition. ........................................................................................... 13

        C.    The Complaint Sufficiently Pleads a Violation of
            47 C.F.R. § 73.3999.. ............................................................................. 15

    II.    DEFENDANTS' FIRST AMENDMENT CHALLENGES TO THE
        COMMISSION'S INDECENCY POLICIES ARE WITHOUT MERIT. ............ 16

        A.    The Emergence of V-Chip Technology Is Inconsequential to the
            Impact of *Pacifica* and *ACT III* on Defendants' Constitutional
            Challenges. ........................................................................................... 19

        B.    The Supreme Court's Decision in *Reno v. ACLU* Did Not Disturb
            Its Prior Ruling in *Pacifica*. .................................................................. 21

    III.    DEFENDANTS' OTHER DISMISSAL ARGUMENTS ARE
        IRRELEVANT TO THE LEGAL CLAIMS IN THIS ACTION.......................... 23

        A.    The Pixilation of the Nude Body Parts in *Married by America* Did
            not Remove the Material, as a Matter of Law, from the Commission's
            Indecency Definition. ............................................................................. 24

        B.    Defendants' Violations Do Not as a Matter of Law Need to Be
            Predicated on a Complaint of a "Bona Fide" Viewer. .............................. 26

CONCLUSION.................................................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*ABC, Inc. v. Federal Communications Comm'n,*
   No. 08-0841 (2d Cir.)..........................................................................................  10

*AT&T Corp. v. Federal Communications Comm'n,*
   323 F.3d 1081 (D.C. Cir. 2003). .......................................................................  10

*Action for Children's Television v. Federal Communications Comm'n,*
   *59 F.3d 1249 (D.C. Cir. 1995)*.............................................................................  8

*Action for Children's Television v. Federal Communications Comm'n,*
   932 F.2d 1504 (D.C. Cir. 1991). ......................................................................  21

*Action for Children's Television v. Federal Communications Commission,*
   852 F.2d 1332 (D.C. Cir. 1988). .................................................................  21, 27

*Action for Children's Television v. Federal Communications Commission,*
   58 F.3d 654 (D.C. Cir. 1995), cert. denied, 516 U.S. 1043 (1996)...........................  passim

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)......................................................................................  10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)..........................................................................................  12

*CBS Corp. v. Federal Communication Comm'n,*
   __ F.3d __, 2008 WL 2789307 (3d Cir. 2008). ..........................................  10, 12, 13, 14

*Carter v. United States,*
   530 U.S. 255 (2000)..........................................................................................  11

*Federal Communications Comm'n v. League of Women Voters of Calif.,*
   468 U.S. 364 (1984)..........................................................................................  17

*Federal Communications Comm'n v. Summa Corp.,*
   447 F. Supp. 923 (D. Nev. 1978). .......................................................................  8

*Federal Communications Commission v. Pacifica Foundation,*
   438 U.S. 726 (1978).....................................................................................  passim

*Hamling v. United States,*
   418 U.S. 87 (1974)...........................................................................................  11

*La Voz Radio de la Communidad v. Federal Communications Comm'n,*
    223 F.3d 313 (6th Cir. 2000) . ........................................................................... 9

*Minority Television Project, Inc. v. Federal Communications Comm'n,*
    2007 WL 781974 (N.D. Cal., Mar. 13, 2007). .............................................. 16

*Northcross v. Board of Educ.,*
    412 U.S. 427 (1973). ....................................................................................... 9

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997). ............................................................................... 21, 22

*Sable Comm'ns of California v. Federal Communications Comm'n,*
    492 U.S. 115 (1989). ..................................................................................... 17

*Secretary of Labor v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006). .................................................................... 27

*Tallman v. United States,*
    465 F.2d 282 (7th Cir. 1972). ...................................................................... 12

*United States v. Any and All Radio Station Transmission Equip.,*
    204 F.3d 658 (6th Cir. 2000). ........................................................................ 9

*United States v. Any and All Radio Station Transmission Equip.,*
    207 F.3d 458 (8th Cir. 2000). ........................................................................ 9

*United States v. Daniels,*
    418 F. Supp. 1074 (D.S.D. 1976). ................................................................ 8

*United States v Dunifer,*
    219 F.3d 1004 (9th Cir. 2000). ..................................................................... 9

*United States v. Evergreen Media Corp.,*
    832 F. Supp. 1183 (N.D. Ill. 1993). ........................................................... 16

*United States v. Northeast Communications of Wisconsin, Inc.,*
    2008 WL 2563234 (E.D. Wis., June 25, 2008). .......................................... 16

*United States v. Szoka,*
    260 F.3d 516 (6th Cir. 2001). ........................................................................ 9

*Williams v. Conner,*
    522 F. Supp. 2d 92 (D.D.C. 2007). ............................................................ 10

## STATUTES AND REGULATIONS

47 C.F.R. § 1.80(b)(1) .................................................................................. 4

47 C.F.R. § 73.3999(b). ........................................................................ passim

65 Fed. Reg. 60868 (2000) .......................................................................... 4

5 U.S.C. § 706(2). ....................................................................................... 9

18 U.S.C. § 1464. ................................................................................ passim

28 U.S.C. § 2342(1). ........................................................................ 1, 9, 10

47 U.S.C. § 402(a). ..................................................................................... 10

47 U.S.C. § 503(b)(1)(B). ................................................................ 4, 12, 27

47 U.S.C. § 503(b)(1)(D). ............................................................................ 4

47 U.S.C. § 504 ................................................................................... passim

Radio Act of 1927, ch. 169, § 29, 44 Stat. 1172. ........................................ 2

138 Cong. Rec. S7308 (June 2, 1992). ...................................................... 15

Pub. L. No 73-416. ...................................................................................... 2

Pub. L. No. 86-752. ..................................................................................... 8

Pub. L. No. 102-356. ............................................................................ 2, 15

Pub. L. No. 109-235. ............................................................................. 4, 13

H.R. Rep. No. 5, 109th Cong., 1st Sess. 2 (2005). ................................... 13

H. Conf. Rep. No. 97-765, *reprinted in* 1982 U.S.C.C.A.N. 2261. ............... 12

S. Rep. No. 1857, 86th Cong., 2d Sess. 10 (1960). ................................. 8, 9

Proposed Amendments to FCC Act of 1934: Hearing before the Communications Subcomm.
  of the S. Comm. On Interstate & Foreign Commerce on S. 1898, 86th Cong. 2d Sess. 81
  (Aug. 10, 1960). ...................................................................................... 8

Fed. R. Civ. P. 12(b)(6) .............................................................................. 13

# MISCELLANEOUS

Matter of Complaint Against Various Broadcast Licensees Regarding Their Airing of the
UPN Network Program "Buffy the Vampire Slayer" on November 20, 2001,
19 FCC Rcd 15995 (2004). ............................................................. 26

Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television
Network Program "Married By America" on April 7, 2003, Forfeiture Order,
23 FCC Rcd 3224 (2008). ............................................................... 5

Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television
Network Program "Married By America" on April 7, 2003, Notice of
Apparent Liability for Forfeiture,
19 FCC Rcd 20191 (rel Oct. 12, 2004). ............................................. 6

Complaints Against Various Television Licensees Concerning Their February 1, 2004
Broadcast of the Super Bowl XXXVIII Halftime Show, Order on Reconsideration,
21 FCC Rcd 6653 (2006), vacated and remanded on other grounds,
CBS Corporation, 2008 WL 2789307 (3d Cir. 2008). .......................... 19, 28

Matter of Complaints Against Various Television Station Licensees Regarding the ABC
Television Network's November 15, 2004, Broadcast of "Monday Night Football,"
20 FCC Rcd 5481 (2005). ............................................................... 26

Matter of Complaints by Parents Television Council Against Various Broadcast Licensees
Regarding Their Airing of Allegedly Indecent Material,
20 FCC Rcd 1920 (2005). ............................................................... 25

Complaints Regarding Various Television Broadcasts Between February 2, 2002 and
March 8, 2005, Notices of Apparent Liability and
Memorandum  Opinion and Order,
21 FCC Rcd 2664 (2006). ............................................................... 24, 27

Complaints Regarding Various Television Broadcasts Between February 2, 2002 and
March 8, 2005, Order,
21 FCC Rcd 13299 (2006). .............................................................. 28

Enforcement Policies Regarding Broadcast Indecency, Policy Statement,
16 FCC Rcd 7999 (2001). ............................................................. passim

Matter of KSAZ license, Inc.,
19 FCC Rcd 15999 (2004). ............................................................. 25, 26

## INTRODUCTION

Between the hours of 6:00 a.m. and 10:00 p.m., when children are likely to be in the

viewing audience, federal regulation prohibits television stations from broadcasting "indecent"

material. *See* 47 C.F.R. § 73.3999(b). Such material is defined as that which describes or

depicts sexual or excretory organs or activities and is patently offensive as measured by

contemporary community standards for the broadcast medium. The prohibition has been upheld

by the Supreme Court and the D.C. Circuit against constitutional challenge. Defendants Fox

Television Stations, Inc. and TVT License, Inc. ("Defendants") nevertheless urge the Court to

overturn such precedent and dismiss this action, which seeks to recover a forfeiture penalty under

47 U.S.C. § 504 that the Federal Communications Commission (the "Commission" or "FCC")

assessed against Defendants for their broadcast of indecent material in violation of that

prohibition. Specifically, on April 7, 2003, Defendants aired before 10:00 p.m. an episode of the

reality-based program *Married by America* that contained numerous scenes of semi-nude

strippers engaging in sexual activities with guests at bachelor and bachelorette parties in Las

Vegas, Nevada. Defendants do not dispute that the Complaint sufficiently alleges a regulatory

violation. Instead, they ask this Court to do what neither the D.C. Circuit nor the Supreme Court

has done – hold the regulation unconstitutional.

While that is reason alone to reject Defendants' request, the Court alternatively should

deny their Motion to Dismiss to the extent it seeks dismissal on constitutional grounds because

such challenges are not properly before this Court. By statute, the courts of appeals have

exclusive jurisdiction "to enjoin, set aside, suspend (in whole or in part), or to determine the

validity of" final orders of the Commission. *See* 28 U.S.C. § 2342(1). Defendants'

constitutional challenges here are a clear attempt to circumvent that exclusive jurisdiction of the

courts of appeals and therefore should not be sanctioned by this Court.  The regulatory violation alleged in this action accordingly withstands dismissal.

The same is true of the statutory violation.  In addition to broadcasting indecent material during prohibited hours in violation of federal regulation, Defendants' broadcast also violated a *statutory* prohibition against the broadcast of indecent language.  *See* 18 U.S.C. § 1464.  Based on a contrived interpretation of that provision and authorities construing it, Defendants move the Court to dismiss the statutory violation on grounds that the Complaint does not allege certain elements that Defendants, but not the courts, have read into the statute.  That, too, is an insufficient basis on which to dismiss the Complaint.  Since Defendants' arguments are without merit, the Court should deny Defendants' Motion to Dismiss and allow this action to proceed.

## STATUTORY AND REGULATORY BACKGROUND

Since as early as 1927, federal law has prohibited persons from engaging in broadcasting that is "obscene, indecent, or profane."  Radio Act of 1927, ch. 169, § 29, 44 Stat. 1172; *see* Communications Act of 1934, Pub. L. No 73-416, § 326, 48 Stat. 1064.  This prohibition is currently codified at 18 U.S.C. § 1464, which authorizes penalties to be imposed on "[w]hoever utters any obscene, indecent, or profane language by means of radio communication."  *See* 18 U.S.C. § 1464.  The Supreme Court upheld the Commission's authority to regulate broadcast indecency under Section 1464 against statutory and constitutional challenges in *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726 (1978).

Subsequently, in Section 16(a) of the Public Telecommunications Act of 1992, Pub. L. No. 102-356, § 16(a), 106 Stat. 954, Congress directed the Commission to "promulgate regulations to prohibit the broadcasting of indecent programming" during certain times of the

day.  The constitutionality of the Commission's authority to promulgate implementing rules was

upheld by the D.C. Circuit, sitting en banc, in *Action for Children's Television v. Federal*

*Communications Commission ("ACT III")*, 58 F.3d 654, 669-70 (D.C. Cir. 1995), *cert. denied*,

516 U.S. 1043 (1996), insofar as the regulations prohibited "the broadcasting of indecent

programs [from] the period from 6:00 a.m. to 10:00 p.m."  Accordingly, the Commission's

regulation currently provides that "[n]o licensee of a radio or television broadcast station shall

broadcast on any day between 6 a.m. and 10 p.m. any material which is indecent."  47 C.F.R.

§ 73.3999(b).

The Commission set out its general framework for analyzing violations of its broadcast

indecency rules in industry guidance published in 2001.  *See Industry Guidance on the*

*Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding*

*Broadcast Indecency*, Policy Statement, 16 FCC Rcd 7999 (2001).  Under the *Industry Guidance*,

an indecency finding by the Commission must be supported by "at least two fundamental

determinations."  *Id.* at 8002 ¶ 7.  "First, the material alleged to be indecent must fall within the

subject matter scope of [the Commission's] indecency definition – that is, the material must

describe or depict sexual or excretory organs or activities."  *Id*. (citation omitted).  "Second, the

broadcast must be *patently offensive* as measured by contemporary community standards for the

broadcast medium."  *Id*. at ¶ 8.  The "principal factors" in determining patent offensiveness are:

"(1) the *explicitness or graphic nature* of the description or depiction of sexual or excretory

organs or activities; (2) whether the material *dwells on or repeats at length* descriptions of sexual

or excretory organs or activities; [and] (3) *whether the material appears to pander or is used to*

*titillate, or whether the material appears to have been presented for its shock value*."  *Id*. at 8003

3

¶ 10.  The Commission emphasized that in evaluating these factors, "the overall context of the broadcast in which the disputed material appeared is critical," and that "[e]ach indecency case presents its own particular mix of these, and possibly other, factors, which must be balanced to ultimately determine whether the material is patently offensive and therefore indecent."  *Id*.

Any person who is determined by the Commission to have "willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter," 47 U.S.C. § 503(b)(1)(B), or to have "violated any provision of section . . . 1464 of title 18[, United States Code,]" 47 U.S.C. § 503(b)(1)(D), "shall be liable to the United States for a forfeiture penalty," 47 U.S.C. § 503(b)(1).[1]  The Act provides that such forfeitures "shall be recoverable . . . in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office or in any district through which the line or system of the carrier runs . . . [in] a trial de novo."  47 U.S.C. § 504(a).

**STATEMENT OF FACTS**

In the Spring of 2003, the Fox Television Network aired a weekly, hour-long, "reality-based" television program entitled *Married by America*.  The premise of the program was that five single adults agree to be engaged to and potentially marry individuals selected by the viewing audience from a group of potential suitors.  By the April 7, 2003 episode, there were only two couples remaining from the original contestants and suitors.  During the episode, scenes

---

[1] Until 2006, the maximum amount of any single forfeiture the Commission could impose on a broadcast licensee was $25,000, adjusted for inflation.  *See* 47 U.S.C. § 503(b)(2)(A); *see also Inflation Adjustment of Maximum Forfeiture Penalties*, 65 Fed. Reg. 60868, 60869 (2000).  In 2006, Congress increased the maximum amount for broadcast indecency violations to $325,000 a day, up to a maximum of $3,000,000.  Broadcast Decency Enforcement Act of 2005, Pub. L. No. 109-235, 120 Stat. 491 (2006); *see also* 47 C.F.R. § 1.80(b)(1).

are shown from an apparent videotaped interview of each of the grooms- and brides-to-be about separate Las Vegas bachelor and bachelorette parties given in their honor.  Interspersed throughout the interview takes are scenes from the parties in which strippers attempted to lure the guests of honor into sexually compromising positions.  *See* Complaint for Recovery of a Monetary Forfeiture ("Compl.") ¶¶ 20, 21.  All of the party scenes from the episode were prerecorded.  *See* Compl. ¶ 38.  While Defendants could have edited or declined the content prior to broadcast, they did not.  *See id.*  Instead, the following material was broadcast over the airwaves:

During the bachelorette party, "a male stripper wearing pants and no shirt" is shown "on top of a woman wearing a miniskirt who is lying on her back on the floor."  *Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television Network Program "Married By America" on April 7, 2003*, Forfeiture Order, 23 FCC Rcd 3224, FCC 08-63 ¶ 7 (rel. Feb. 22, 2008), incorporated by reference at Compl. ¶ 23 (hereinafter "Forfeiture Order").  The stripper "thrust[s] his crotch into [the woman's] face," and then "mov[es] down her body toward her upper thighs," where "whipped cream is shown on her bare legs just below her crotch."  Forfeiture Order ¶ 7; Compl. ¶ 21.  The camera cuts away from the scene just as the stripper "places his face directly above the spot, apparently to lick off the whipped cream."  Forfeiture Order ¶ 7.  "One of the brides-to-be is shown placing her lips over a stripper's nipple, which is covered in whipped cream."  Forfeiture Order ¶ 7.  In a different scene, the second bachelorette "kneel[s] behind a topless male stripper" and "smear[s] whipped cream on his stomach."  Forfeiture Order ¶ 7.  The stripper is "then shown from the front, wearing only shorts, holding the

woman's hand by the wrist and moving it down his chest and stomach towards his crotch." Forfeiture Order ¶ 7.

In a later scene of the party, a female stripper arrives and "sits on the laps of the two brides-to-be" and "kisses one."  Forfeiture Order ¶ 9.  The stripper is then shown "lying topless, on a couch cupping her breasts with her hands" while one of the bachelorettes "straddles her." Forfeiture Order ¶ 9.  The bachelorette explains to the camera that "'I was touching her.  Jill was touching her.  I licked the whipped cream off her.'"  Forfeiture Order ¶ 9.  The same bachelorette is then shown "leaning over the stripper, who is again lying on the couch cupping her breasts, this time with whipped cream on her chest and stomach," and then moving her face "up from the stripper's breasts toward her mouth as both women stick out their tongues, apparently about to kiss."  Forfeiture Order ¶ 9.

Meanwhile at the bachelor party, where two female strippers have arrived, one of the bachelors "sit[s] on a couch without his shirt as the two performers, now topless, straddle him, apparently kissing one another."  Forfeiture Order ¶ 8.  He is then shown on all fours in his underwear as the two female strippers "clad only in thongs (their breasts are pixilated)" playfully spank him with a whip or belt.  *See* Compl. ¶ 29; Forfeiture Order ¶ 8; *Complaints Against Various Licensees Regarding Their Broadcast of the Fox Television Network Program "Married By America" on April 7, 2003*, Notice of Apparent Liability for Forfeiture ("NAL"), 19 FCC Rcd 20191 ¶ 10 (rel Oct. 12, 2004), incorporated by reference at Compl. ¶ 22.  The scene ends with the prospective groom "lying on his back, shirtless, with the two strippers above him caressing his chest."  Forfeiture Order ¶ 8.

Later in the episode, the second bachelor is shown receiving a lap dance from a third topless female stripper. *See* Compl. ¶ 21. She "straddl[es] him on the couch, thrusting her crotch toward his, and remov[es] her top (again, her breasts are pixilated) so that her breasts are a foot or so from his face." Forfeiture Order ¶ 10. The camera then pans to a view of the other bachelor. "The scene ends with [him] . . . kissing one of the strippers, stating that there's 'nothing wrong with kissing a stripper before you're married. Kissing a stripper after you're married, that's when the trouble begins.'" Forfeiture Order ¶ 10.

Taken together, the various party scenes span a six-minute period. *See* NAL ¶ 11. The whole point of the strippers' performances appears to be to titillate the brides- and grooms-to-be, and, by extension, the audience. Compl. ¶ 31. Although the nudity was pixilated, even a child viewing the episode would have known that sexual activity was being shown. NAL ¶ 10. Defendants nevertheless chose to broadcast such material in the evening before 10:00 p.m. when there was a reasonable risk that children were in the viewing audience. *See* Compl. ¶ 34; NAL ¶ 13.

Following the broadcast, the Commission received complaints that the episode contained indecent material. On October 12, 2004, the Commission released a Notice of Apparent Liability preliminarily finding that Defendants' April 7, 2003 broadcast of *Married by America*'s depiction of sexual activities and female nudity was indecent in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. *See* Compl. ¶ 22. After Defendants had an opportunity to contest that finding, the Commission released a Forfeiture Order on February 22, 2008 finding that Defendants had violated 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999 and ordering each Defendant to pay a forfeiture penalty in the amount of $7,000 by March 22, 2008. *See* Compl. ¶¶ 23, 24.

7

Because Defendants here failed to pay by that date, the United States commenced this action

under 47 U.S.C. § 504 to recover that forfeiture penalty.

## SCOPE OF REVIEW

Notwithstanding the broad range of issues raised in Defendants' Motion to Dismiss, the

scope of this Court's review here is limited.  *See generally* Memorandum of Points and

Authorities in Support of Defendants' Motion to Dismiss the Complaint ("Defs. Mot.") at 6-33

(filed June 2, 2008) [Dkt. No. 13].  An action pursuant to 47 U.S.C. § 504 for the recovery of a

forfeiture imposed "shall be a trial de novo" "on the question whether [Defendants'] broadcast

was indecent."  47 U.S.C. § 504; *Action for Children's Television v. Federal Communications

Comm'n* , 59 F.3d 1249, 1254 (D.C. Cir. 1995).  As such, the Court's only task is to determine

whether Defendants' April 7, 2003 broadcast of *Married by America* was indecent.  The

Commission's determination is not entitled to deference.  *See Federal Communications Comm'n

v. Summa Corp.*, 447 F. Supp. 923, 925 (D. Nev. 1978) ("It follows from the grant of trial *de

novo* jurisdiction to the district courts that this court is not limited to a review of the

administrative record before the FCC, nor do the findings and conclusions of the Commission *in

this case* carry any weight whatsoever." (emphasis added)).  Rather, applying the same indecency

standard as the Commission, the Court must determine whether the facts support a finding that

Defendants violated 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999.  *See United States v. Daniels*,

418 F. Supp. 1074, 1080-81 (D.S.D. 1976) (concluding from the "de novo" language in Section

504(a) that the "judicial review granted . . . must necessarily include the power to review both the facts surrounding the alleged violation and the amount of any forfeiture imposed").[2]

Defendants improperly seek to expand the permissible review here by raising constitutional challenges to the Commission's indecency policies. *See* Defs. Mot. at 23-34. Such challenges effectively convert this action into one "to 'enjoin, set aside, suspend [and] determine the validity of' a final order of the FCC." *United States v Dunifer*, 219 F.3d 1004, 1007 (9th Cir. 2000). By statute, however, the courts of appeals have *exclusive* jurisdiction over such challenges. *See* 28 U.S.C. § 2342(1) ("The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of – (1) all final orders of the Federal Communications Commission . . . ."); *United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) ("It is hard to think of clearer

---

[2] Borrowing the standard of review from the Administrative Procedure Act ("APA"), Congress added the "trial de novo" language in 1960 out of concern that a suit for recovery of a forfeiture otherwise would be "merely a collection proceeding." *See* Pub. L. No. 86-752, § 7(a), 74 Stat. 889, 894-95 (1960); S. Rep. No. 1857, 86th Cong., 2d Sess. 10 (1960); *see also Proposed Amendments to FCC Act of 1934*: *Hearing before the Communications Subcomm. of the S. Comm. on Interstate & Foreign Commerce on S. 1898*, 86th Cong., 2d Sess. 81 (Aug. 10, 1960) (testimony of Warren Baker, Fed. Comm'n Bar Ass'n) (urging Congress to ensure that the legislation "make it quite clear that on any collection . . . there would be in issue not only the question of whether there had been a violation, but . . . the reasonableness of the amount of the penalty imposed"); *id.* at 91 (testimony of Admin. L. Sect. of Amer. Bar Ass'n) (urging Congress to establish "the kind of hearing which the Administrative Procedure Act contemplates before the imposition of any [] orders [finding a violation and directing the payment of a penalty]"). Rather, Congress intended the proceeding to be one "in which the person against whom the forfeiture is ordered is given an opportunity to contest on the merits the action of the Commission." *See* S. Rep. No. 1857 at 10. Thus, as under Section 706(2) of the APA, this Court's review is limited to disputed *factual* matters. *See* 5 U.S.C. § 706(2)(F) (describing trial de novo as review of disputed "facts"); *cf. Northcross v. Board of Educ.*, 412 U.S. 427, 428 (1973) (noting that where Congress uses the same form of statutory language in different statutes, courts should presume that Congress intended the same interpretation to apply it).

language confining the review of regulations to the Courts of Appeal."). *But see United States v. Any and All Radio Station Transmission Equip.*, 204 F.3d 658, 667 (6th Cir. 2000).[3]  Thus, Defendants' constitutional challenges to the Commission's indecency policies are not properly before this Court.[4]

## ARGUMENT

**I.    THE UNITED STATES HAS SUFFICIENTLY PLED VIOLATIONS OF 18 U.S.C. § 1464 AND 47 C.F.R. § 73.3999.**

Apparently conceding the sufficiency of the allegations of a regulatory violation, Defendants' only claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is that the United States has not pled a violation of 18 U.S.C. § 1464.  *See* Defs. Mot. at 6-13 (alleging that the United States has not alleged the requisite scienter or conduct for a Section 1464 violation). The standard of review for a Rule 12(b)(6) motion is well established.  *See Bell Atlantic Corp. v.*

---

[3]  It is noteworthy that the Sixth Circuit's decision relied on the panel opinion later overturned in *United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000); moreover, subsequent Sixth Circuit decisions have refused to find jurisdiction in district courts over defensive challenges raised in FCC enforcement suits.  *See, e.g.*, *United States v. Szoka*, 260 F.3d 516, 530 (6th Cir. 2001) (challenging FCC cease and desist order); *La Voz Radio de la Communidad v. Federal Communications Comm'n*, 223 F.3d 313, 317-20 (6th Cir. 2000) (seeking injunctive relief against FCC enforcement).

[4]  The limited scope of the district court proceeding under § 504(a) does not leave indecency forfeiture defendants without a means to bring constitutional and other challenges to the Commission's indecency regulations and policies; rather, such defendants must do so by way of a petition for review filed in the court of appeals.  As the D.C. Circuit has held, such a petition may be filed pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1) after payment of the forfeiture. *See AT&T Corp. v. Federal Communications Comm'n*, 323 F.3d 1081, 1085 (D.C. Cir. 2003). Indeed, this course was followed in recent challenges to Commission indecency forfeiture orders involving CBS's broadcast of the 2004 Super Bowl halftime show and an ABC broadcast of *NYPD Blue*.  *See CBS Corp. v. Federal Communication Comm'n*, __ F.3d __, 2008 WL 2789307 (3d Cir. 2008); *ABC, Inc. v. Federal Communications Comm'n*, No. 08-0841 (2d Cir.) (government's brief due Aug. 22, 2008).

*Twombly*, 127 S. Ct. 1955, 1965 (2007).  On such a motion, "the Court 'must accept as true all of the factual allegations contained in the complaint.'"  *Williams v. Conner*, 522 F. Supp. 2d 92, 97 (D.D.C. 2007).  The "complaint 'is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged.'"  *Id.*  Under that standard, the Complaint here easily withstands dismissal under Rule 12(b)(6).  *Compare* Compl. ¶¶ 16, 26-32, 36-39 *with* 18 U.S.C. § 1464 ("Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both.").

### A.    The Complaint Sufficiently Pleads Scienter.

Defendants erroneously contend that "the Government's Complaint should be dismissed because it does not allege that Fox broadcast *Married by America* with the requisite mental state."  Defs. Mot. at 6.  Section 1464 does not expressly specify a requisite mental state.  Defendants, however, read one in that is clearly higher than any court has suggested would be appropriate in this context.  Specifically, Defendants contend that "to plead a violation of § 1464, the government must allege that Fox knowingly broadcast the allegedly indecent images with the understanding that those images were indecent."  Defs. Mot. at 6.  In criminal obscenity cases, however, the Supreme Court repeatedly has rejected suggestions that the "prosecution must prove a defendant's knowledge of the legal status of the materials he distributes."  *Hamling v. United States*, 418 U.S. 87, 121 (1974) (rejecting argument that "proof of scienter in obscenity prosecutions requires . . . 'proof both of knowledge of the contents of the material and awareness of the obscene character of the material'").

11

Indeed, "[t]o require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law. Such a formulation of the scienter requirement is required neither by the [statutory] language . . . nor by the Constitution." *Id.* at 123-24. Rather, the "presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000); *e.g.*, *CBS Corporation*, 2008 WL 2789307, at *30, *31 (suggesting that "[r]ecklessness would appear to suffice as the appropriate scienter threshold for the broadcast indecency regime" and concluding that the "airing of scripted indecency or indecent material in pre-recorded programming [as here] would likely show recklessness, or may even constitute evidence of actual knowledge or intent"); *see also Tallman v. United States*, 465 F.2d 282, 287 (7th Cir. 1972) ("In contradistinction to knowledge of the facts which make a publication or utterance obscene, the actor need not know the law which would characterize it as such."). Defendants' arguments to the contrary are without merit.

Whatever the requisite scienter for a Section 1464 violation, the Complaint's allegations satisfy that requirement.[5] The *Married by America* "episode depicted or described strippers

---

[5] To the exclusion of the other scienter allegations, Defendants latch onto the definition of "willful" quoted in Paragraph 37 of the Complaint and contend that the definition "applies only to FCC proceedings involving either the revocation of a license or construction permit, or a cease and desist order," (Defs. Mot. at 8). *See* Compl. ¶ 37 (defining "willful" as "the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any provision of this [Act] or any rule or regulation of the Commission"). Congress, however, intended that definition "to clarify the language in Sections 312 *and 503*," both of which use the term "willful." H. Conf. Rep. No. 97-765, at 51, *reprinted in* 1982 U.S.C.C.A.N. 2261, 2295 (emphasis added); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993) ("the normal rule of statutory construction" is "that identical words used in different parts of the same act are intended to have the same meaning" (internal quotations

luring partygoers into engaging in sexual behavior . . . in a graphic and explicit manner" such that the "pixilation of the nude body parts in the scenes did not obscure the overall graphic nature of the depictions to the average viewer."  Compl. ¶ 29.  This "indecent material in the April 7, 2003 episode was prerecorded."  Compl. ¶ 38.  Defendants "could have edited or declined the content prior to broadcast" but did not.  *Id.*  Instead, Defendants "consciously and deliberately broadcast the April 7, 2003 episode."  Compl. ¶ 39.  Construing such allegations favorably to the United States, they clearly are sufficient on the element of scienter to withstand dismissal under Rule 12(b)(6).

### B.    The Complaint Alleges Conduct Within Section 1464's Prohibition.

Defendants alternatively contend that the Complaint should be dismissed because the plain language of Section 1464 does not extend to indecent images but only to "utter[ances]" of spoken language.  *See* Defs. Mot. at 13; *see also* 18 U.S.C. § 1464.  The implication of Defendants' argument – that Congress did not intend to sanction the broadcast of indecent images by "radio communication," a term statutorily defined to include "pictures" – is reason alone to reject it.  Indeed, neither courts nor Congress have adopted so contrived a reading of Section 1464.  *See, e.g., CBS Corporation*, 2008 WL 2789307, at *4; Broadcast Decency Enforcement Act of 2005 ("BDEA"), Pub. L. 109-235, 120 Stat. 491 (2006); H. Rep. 109-5, 109th Cong., 1st Sess. at 1-2 (explaining the purpose of the BDEA as "to provide the Federal Communication Commission (FCC) with enhanced authority to deal with obscenity, indecency and profanity on broadcast television"); *id.* at 2 (explaining that "concerns about programming

---

omitted)).  Thus, that definition of "willful" applies to a forfeiture imposed, as here, pursuant to Section 503.

content were exacerbated when, on Sunday, February 1, 2004, CBS broadcast the National

Football League's Super Bowl XXXVIII . . . halftime show . . . that ended in the exposure of

[Janet] Jackson's breast").[6]  Rather, the Commission is recognized as having the authority "to

regulate obscene, indecent, or profane broadcast *content*."  *CBS Corporation*, 2008 WL 2789307,

at *4 (emphasis added) (citing in support for that statement 18 U.S.C. § 1464).  Thus, "[a]lthough

the text [of Section 1464] on its face only reaches spoken words, it is applied broadly, as here, to

reach all varieties of indecent content."  *Id.* at *13 n.13.  That broad application, moreover,

clearly has the approval of Congress.  *See* H. Rep. 109-5, 109th Cong., 1st Sess. at 1-2.

Given this accepted reach of Section 1464, the Complaint sufficiently pleads indecent

content and thus withstands dismissal under Rule 12(b)(6).  *See, e.g.,* Compl. ¶ 21 (alleging that

the "episode included scenes depicting or describing, among other things, the caressing of naked

chests and stomachs, the thrusting of a male stripper's crotch into a woman's face, a topless

female stripper performing a lap dance for a groom-to-be, a topless female stripper spanking with

a whip or a belt the buttocks of a topless man who is on all fours, two topless female strippers

apparently kissing while straddling a shirtless man, and a female stripper cupping her own bare

---

[6] Section 2 of the BDEA substantially increased the maximum forfeitures that may be levied against licensees that broadcast "obscene, indecent, or profane language."  *See* 120 Stat. 491 (to be codified at 47 U.S.C. § 503(b)(2)(C)(ii)).  In doing so, the House Report cited prominently the February 1, 2004 broadcast of the National Football League's Super Bowl XXXVIII half-time performance by Janet Jackson and Justin Timberlake as evidence of the need for more rigorous enforcement of the broadcast-indecency prohibition.  H.R. Rep. No. 5, 109th Cong., 1st Sess. 2 (2005).  That Congress had this broadcast (involving an indecent image) in mind when it decided to increase the maximum forfeitures clearly evidences that the Commission can prohibit the broadcast of indecent images as well as words.  Although the Third Circuit recently vacated the Commission's forfeiture order finding that broadcast indecent, the Court did not question the Commission's authority to regulate indecent images.  *See CBS Corporation*, 2008 WL 2789307, at *4, *13 n.13.

breasts and puckering her lips"); Compl. ¶ 29 (alleging that "Defendants' broadcasts of the April 7, 2003 episode depicted or described strippers luring partygoers into engaging in sexual behavior . . . in a graphic and explicit manner"). To the extent Defendants, notwithstanding their concession that the *Married by America* episode contained "sexual content" and "sexual situations," (Defs. Mot. at 14 n.21), contend that dismissal is required because the Complaint "does not allege that the broadcast displayed any actual sexual activity," (Def. Mot. at 14), these allegations clearly belie that contention.[7]  Accordingly, the statutory claim should proceed.

### C.    The Complaint Sufficiently Pleads a Violation of 47 C.F.R. § 73.3999.

The independent regulatory violation alleged in the Complaint also clearly withstands dismissal under Rule 12(b)(6). *Compare* 47 C.F.R. § 73.3999 *with* Compl. ¶¶ 1-35.  Indeed, Defendants do not even dispute the sufficiency of those allegations.  The Commission promulgated 47 C.F.R. § 73.3999 in response to Congress's direction in the Public Telecommunications Act of 1992 to establish a rule prohibiting "indecent *programming*" during certain times of the day.  *See* Pub. L. No. 102-356, § 16(a), 106 Stat. 949 (emphasis added); *see also ACT III*, 58 F.3d at 656 (noting that Section 16(a) "seeks to shield minors from indecent radio and television *programs*" (emphasis added))*.*  That Act's legislative history confirms that Section 16(a) was intended to grant the Commission "authority to prohibit indecent broadcasts" in light of congressional concern about "language and pornographic images."  138 Cong. Rec. S7308 (June 2, 1992) (remarks of Sen. Byrd); *see also id*. at 7309 (remarks of Sen. Helms)

---

[7]  To the extent Defendants contend that the term "sexual activities" is "limited to the specific act of sexual intercourse," such a position finds "no support in [Commission] precedent or in common sense."  Forfeiture Order ¶ 11.

(stating that the provision would "protect our children from indecent programs on radio and television" and describing visual images of concern in prime-time television programs).

Thus, 47 C.F.R. § 73.3999 provides, in relevant part, that "[n]o licensee of a radio or television broadcast station shall broadcast on any day between 6 a.m. and 10 p.m. any *material which is indecent.*"  47 C.F.R. § 73.3999(b) (emphasis added)*.*  The term "material" like the term "programming" in the congressional direction to the Commission encompasses visual as well as verbal indecency.  *See* 106 Stat. 949 (establishing the Commission's clear authority to regulate the broadcast of indecent images, not just indecent speech).  Since the Complaint clearly alleges that Defendants broadcast indecent material between the hours of 6:00 a.m. and 10:00 p.m., the separate regulatory claim in this action should proceed.  *See, e.g.,* Compl. ¶ 29 (alleging that the *Married by America* episode "depicted or described strippers luring partygoers into engaging in sexual behavior"); Compl. ¶ 34 (alleging that "Defendants' broadcasts . . . aired between 6:00 a.m. and 10:00 p.m.").

## II.    DEFENDANTS' FIRST AMENDMENT CHALLENGES TO THE COMMISSION'S INDECENCY POLICIES ARE WITHOUT MERIT.

Although not properly before this Court, (*see* "Scope of Review," *supra*), Defendants' constitutional challenges to the Commission's indecency regulation and standard violated by Defendants' *Married by America* broadcast are unfounded.[8]  *See, e.g.,* Defs. Mot. at 27-32

---

[8]  *See Minority Television Project, Inc. v. Federal Communications Comm'n*, 2007 WL 781974, at *5 (N.D. Cal., Mar. 13, 2007) (dismissing constitutional challenges to FCC regulations and orders in action involving monetary forfeiture imposed for violation of advertising restrictions on noncommercial broadcasters).  Two district courts nevertheless have considered constitutional challenges in actions, as here, under 47 U.S.C. § 504.  *See, e.g., United States v. Northeast Communications of Wisconsin, Inc.*, 2008 WL 2563234, at *3 (E.D. Wis., June 25, 2008) (entertaining statutory and constitutional challenges to FCC anti-collusion rule); *United States v. Evergreen Media Corp.*, 832 F. Supp. 1183, 1185-86 (N.D. Ill. 1993) (entertaining constitutional

16

(erroneously contending that the Commission's indecency standard is unconstitutionally vague and not in furtherance of a compelling interest).  Precedent binding on this Court is dispositive of Defendants' constitutional challenges.  *See Federal Communications Comm'n v. Pacifica*, 438 U.S. 726 (1978); *Action for Children's Television v. Federal Communications Comm'n ("ACT III")*, 58 F.3d 654 (D.C. Cir. 1995) (en banc).  In recognition of the "unique considerations" involved in regulating the broadcast spectrum, (*Federal Communications Comm'n v. League of Women Voters of Calif.*, 468 U.S. 364, 376 (1984)), the Supreme Court and the D.C. Circuit have held that "traditional broadcast media are properly subject to more regulation than is generally permissible under the First Amendment."  *ACT III*, 58 F.3d at 660; *see also Pacifica*, 438 U.S. at 748 ("[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection.").  Such unique treatment is warranted because not only have such media "established a uniquely pervasive presence in the lives of all Americans," but "[p]atently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder."  *Pacifica*, 438 U.S. at 748.  Thus, although suggesting that strict scrutiny applies to the regulation of protected speech "regardless of the medium affected,"[9] the D.C. Circuit has stressed that the "assessment of whether [the regulation]

---

challenge to FCC indecency policies).  Even if the Court reaches Defendants' constitutional challenges, they do not warrant dismissal of this action.

[9]  Strict scrutiny requires that the restriction further a "compelling" government interest and be the "least restrictive means" to further that interest.  *See Sable Comm'ns of California v. Federal Communications Comm'n*, 492 U.S. 115, 126 (1989).

survives that scrutiny must necessarily take into account the unique context of the broadcast medium." *ACT III*, 58 F.3d at 660.[10]

The Commission's indecency regulation and standard have withstood such scrutiny. *See ACT III*, 58 F.3d at 667 (concluding that the Commission's prohibition against indecent broadcasts between 6:00 a.m. and 10:00 p.m. is "narrowly tailored to serve the Government's compelling interest in the well-being of our youth");[11] *see also Pacifica*, 438 U.S. at 749 (concluding that the government's interests in the "well-being of its youth" and in supporting "parents' claim to authority in their own household" can "justif[y] the regulation of otherwise

---

[10] Although the formulation set forth by the D.C. Circuit in *ACT III* may control this case, the government does not concede that *ACT III*'s relaxed strict scrutiny is the appropriate standard. The Supreme Court in *League of Women Voters* held that even where government seeks to regulate broadcast speech that "lies at the heart of First Amendment protection," its interest need only be "substantial" and the restriction need only be "narrowly tailored" to further that interest – not the least restrictive available. *See League of Women Voters*, 468 U.S. at 380, 381. As explained below, however, the Commission's indecency policies are constitutional under either standard.

[11] Notwithstanding the D.C. Circuit's conclusion, Defendants separately and erroneously contend that the Complaint is deficient because it does not allege that the images contained in the *Married by America* broadcast "actually pose[d] any threat to the well-being of children." Defs. Mot. at 31. The D.C. Circuit already has held that "[a] scientific demonstration of psychological harm" is not "required in order to establish the constitutionality of measures protecting minors from exposure to indecent speech." *ACT III*, 58 F.3d at 661-62; *see id*. at 662 ("Congress does not need the testimony of psychiatrists and social scientists in order to take note of the coarsening of impressionable minds that can result from a persistent exposure to sexually explicit material just this side of legal obscenity.").

By prohibiting the broadcast of indecent programming, Section 1464 and Section 16(a) of the Public Telecommunications Act of 1992 presume the requisite harm. In enforcing the statute, the government is not required to reallege the harms that Congress found the statute would address. "Despite a few missing pieces of the visual jigsaw puzzle, a child watching [Defendants' *Married by America*] program easily could discern that partially nude adults [we]re attending a party and participating in sexual activities." Forfeiture Order ¶ 12.

protected expression" (internal quotations omitted)).[12]  Notwithstanding *Pacifica* and *ACT III*, Defendants contend that the emergence of V-Chip technology and the Supreme Court's analysis of the indecency standard in the Communications Decency Act of 1996 render the Commission's indecency standard unconstitutional.  *See* Defs. Mot. at 24-27.  Neither contention has merit.

### A.    The Emergence of V-Chip Technology Is Inconsequential to the Impact of *Pacifica* and *ACT III* on Defendants' Constitutional Challenges.

Defendants contend that dismissal is required because V-Chip technology is an effective and less restrictive alternative to the Commission's indecency regulation.  *See* Defs. Mot. at 27 ("The Government's Complaint – which seeks to enforce a direct ban on protected speech, instead of relying on the less restrictive alternative of the V-Chip – must therefore be dismissed.").  At this juncture in the case, the Court cannot properly dismiss this action on that basis.  Defendants' argument clearly raises factual questions that preclude its resolution on a motion to dismiss.  In any event, Defendants' claim that the V-Chip "is an effective, less speech-restrictive means of addressing the government's interest in protecting children," (Defs. Mot. at 25), is not borne out by studies on that technology.  *See* Forfeiture Order ¶ 30 (concluding that the V-Chip "does not eliminate the need for the Commission to enforce its indecency rules").

The V-Chip requirements, which attempt to provide a means for parents to block objectionable programming, did not take full effect until 2000.  *See* Forfeiture Order ¶ 36.  Thus, at the time Defendants broadcast the *Married by America* episode, most television sets did not

---

[12]  As the D.C. Circuit in *ACT III* explained, the Commission's 10 p.m. to 6 a.m. safe harbor protects children without "unnecessarily interfer[ing] with the ability of adults to watch or listen to" indecent material, "both because substantial numbers of [adults] are active" during those hours, "and because adults have so many alternative ways of satisfying their tastes at other times." *ACT III,* 58 F.3d at 667.  Thus it is "entirely appropriate" "that the marginal convenience of some adults be made to yield to the imperative needs of the young."  *Id.*

contain a V-Chip. *See Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, Order on Reconsideration, 21 FCC Rcd 6653, 6665 ¶ 37 n.123 (2006) ("*Super Bowl Reconsideration Order*") ("Out of a total universe of 280 million television sets in U.S. households, *see Nielsen Media Research U.S. TV Household Estimates, 2003-04*, about 119 million sets in use are equipped with V-chips. Broadcasting & Cable, TVFAX, *TV Watch "Exposes" V-Chip Critics*, July 8, 2005, at 2."), *vacated and remanded on other grounds*, *CBS Corporation*, 2008 WL 2789307, at *33. Even in households with televisions containing the technology, "most parents . . . are unaware of its existence or do not know how to use it." *Id*. & n.81 (citing Annenberg Public Policy Center, *Parents' Use of the V-Chip to Supervise Children's Television Use* 4 (2003)) (reporting that only 27 percent of mothers in a 2003 study group could figure out how to program the V-Chip and that "many mothers who might otherwise have used the V-Chip were frustrated by an inability to get it to work properly"). Finally, "some categories of programming, including news and sports, are not rated" and therefore cannot be blocked; as to the remaining programming, the Commission has found that there are "serious questions about the accuracy of the television ratings on which the effectiveness of a V-Chip depends." *Id*. & n.83 (citing, among others, Henry J. Kaiser Family Foundation, *Parents, Media and Public Policy: A Kaiser Family Foundation Survey* 5 (2004) (reporting that nearly 4 in 10 parents of children aged 2-17 stated that most television programs are not rated accurately)).

Contrary to Defendants' suggestion, (*see* Defs. Mot. at 26), the Commission's position here is not undermined by its determination in 1998 that the industry's V-Chip proposal was "acceptable" and "in compliance with the specific requirements" of federal law. *See*

*Implementation of Section 551 of the Telecommunications Act of 1996, Video Programming Ratings*, Report and Order, 13 FCC Rcd 8232, 8233 ¶ 2 (1998).  At the time, the Commission merely approved the V-Chip rating rules in the abstract; it did not make any determination as to their sufficiency in practice.  *Id.*  On the contrary, the Commission cautioned that "to be useful, the rating system must be applied in a consistent and accurate manner," and anticipated that the industry's commitment to "research and evaluat[e] . . . the rating system, once the system has been in use, w[ould] allow for adjustments and improvements," a commitment that the Commission regarded as "an important element in the proposal" approved.  *Id*. at 8243 ¶ 22.  Thus, in 1998, the Commission simply granted the industry's request to "give the rating system a fair chance to work," *id*. at 8246 ¶ 32; it did not commit to turn a blind eye to the substantial evidence, accumulated since then, that the V-Chip is ineffective in practice.  That technology therefore provides no grounds for dismissal of this action or invalidation of the Commission's indecency regulation.

      **B.**      **The Supreme Court's Decision in *Reno v. ACLU* Did Not Disturb Its Prior Ruling in *Pacifica*.**

Defendants alternatively dismiss the clear import of *Pacifica* and *ACT III* on their constitutional claims here as not reflecting those courts' "considered judgment."  *See* Defs. Mot. at 28 ("No court has ever reached a considered judgment that the FCC's regulation of indecency is not vague.").  As the D.C. Circuit explained in *Action for Children's Television v. Federal Communications Commission*, 852 F.2d 1332 (D.C. Cir. 1988) ("*ACT I*"), the Commission's definition of indecency "is virtually the same definition the Commission articulated in the order reviewed by the Supreme Court in the *Pacifica* case."  *Id.* at 1338.  Thus, when the Supreme

21

Court in that case "h[e]ld the Carlin monologue indecent," it necessarily signaled that it "did not regard the term 'indecent' as so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* at 1338-39 (citation omitted). The D.C. Circuit subsequently *twice* expressly adhered to that view. *See Action for Children's Television v. Federal Communications Comm'n*, 932 F.2d 1504, 1508 (D.C. Cir. 1991) ("*ACT II*"); *ACT III*, 58 F.3d at 659.

Minimizing this evidence of the D.C. Circuit's due consideration of the precise regulatory scheme at issue here, Defendants instead prefer the consideration given the indecency standard struck down in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) (invalidating the indecency standard in the Communications Decency Act ("CDA") of 1996). According to Defendants, because that standard was "almost identical to the FCC's 'indecency' standard," *Reno v. ACLU* is controlling. *See* Defs. Mot. at 28-29. The Court's analysis in that case, however, belies Defendants' suggestion.

In *Reno v. ACLU*, the Court expressly distinguished *Pacifica*. First, the Court noted that the Commission is "an agency that ha[s] been regulating radio stations for decades," and that the Commission's regulations simply "designate when – rather than whether – it would be permissible" to air indecent material. *Reno v. ACLU*, 521 U.S. at 867. The statute in *Reno v. ACLU*, in contrast, was not administered by an expert agency, and it contained "broad categorical prohibitions" that were "not limited to particular times." *Id.* Second, *Reno v. ACLU* involved a criminal statute. The Commission, however, has no power to impose criminal sanctions for indecent broadcasts. *See id.* at 867, 872. Third, the Court recognized that, unlike the Internet, the broadcast media "as a matter of history had 'received the most limited First Amendment

22

protection.'"  *Id*. at 867; *see also id*. at 868 (citing prior decisions recognizing the "special

justifications for regulation of the broadcast media that are not applicable to other speakers").

For all these reasons, the holdings of *Pacifica* and *ACT III* have not been disturbed and thus they

remain dispositive of Defendants' constitutional challenge.[13]

### III.    DEFENDANTS' OTHER DISMISSAL ARGUMENTS ARE IRRELEVANT TO THE LEGAL CLAIMS IN THIS ACTION.

Apparently again misapprehending the applicable scope of this Court's review, (*see*

"Scope of Review," *supra*), Defendants urge this Court to dismiss this action because the

Commission should have found that the *Married by America* episode was like "numerous other

broadcasts that the FCC has held were not indecent," (Defs. Mot. at 18), and should have

dismissed the underlying complaints about the episode as insufficient, (Defs. Mot. at 22).  Such

arguments, however, are beside the point because this Court's review is de novo on the question

of whether the *Married by America* episode was indecent.  *See* 47 U.S.C. § 504.  Thus, to the

extent Defendants move to dismiss this action because of how the Commission has evaluated

other broadcasts or decided to initiate the investigation of this broadcast, their motion should be

---

[13] In a variation on the same theme, Defendants separately argue that the Commission's
indecency standard is unconstitutionally vague because it relies on subjective assessments.  *See*
Defs. Mot. at 32 (complaining that the "forfeiture order that the Government seeks to enforce
here [] depends on . . . impermissible subjective judgments").  The fact that the Commission
considers context in making indecency determinations – and thus has distinguished between the
images of naked concentration camp survivors in *Schindler's List* and those of the strippers
engaging in sexual activities in *Married by America* – does not make its judgments
impermissibly subjective.  On the contrary, the Court in *Pacifica* acknowledged, and indeed
*endorsed*, the Commission's consideration of context in upholding the agency's authority to
regulate broadcast indecency.  *Pacifica*, 438 U.S. at 750, 742 (acknowledging that Commission's
decision "rested entirely on a nuisance rationale under which context is all-important" and
concluding that "indecency is largely a function of context – it cannot be adequately judged in the
abstract").

denied.  *See* Defs. Mot. at 13-22.  Alternatively and independently, those arguments provide no basis to dismiss this action because, at best, they raise factual issues that cannot be resolved on a motion to dismiss.  More fundamentally, however, Defendants' arguments are without merit.

A.    **The Pixilation of the Nude Body Parts in *Married by America* Did not Remove the Material, as a Matter of Law, from the Commission's Indecency Definition.**

Defendants' contention that the material in *Married by America* was not indecent as a matter of law "because the nudity or 'depictions [of] sexual organs' were obscured by pixilation,"[14] (Defs. Mot. at 15), plainly ignores that any indecency determination by the Commission is a multi-factor analysis.  *See Industry Guidance*, 16 FCC Rcd at 8002-03 ¶ 9.  The "graphic and explicit" factor is just one of several factors that the Commission considered in determining that the *Married by America* episode was indecent.  *See* Compl. ¶¶ 27-32.  The Commission acknowledged that "the pixilation of the female strippers' naked breasts and buttocks does render the material less explicit and graphic than it would have been in the absence of pixilation."  Forfeiture Order ¶ 12.  Nevertheless, the Commission concluded that the material in Defendants' broadcasts was "still sufficiently graphic and explicit to support an indecency finding."  *Id*.  "[D]espite the obscured nature of the nudity, it is unmistakable that the partygoers are participating in sexual activities and that sexual organs are being exposed."  Forfeiture Order ¶ 12 (concluding that even a child watching this program easily could discern that sexual activities were taking place).  Since "[t]he pixilation of the nude body parts in the scenes did not obscure the overall graphic nature of the depiction to the average viewer," (Complaint ¶ 29), the

---

[14] Pixilation is a technique by which the resolution of a visual image is greatly reduced by enlarging the pixels and reducing their number in an effort to obscure portions of an image.

Commission properly concluded that the *Married by America* episode satisfied its indecency standard. *See, e.g.,Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005* ("*Omnibus Order*"), Notices of Apparent Liability and Memorandum Opinion and Order, 21 FCC Rcd 2664 ¶ 24 (2006) (concluding that ten-minute party sequence in *Surreal Life 2* that displayed approximately 20 pixilated views of various female guests' nude breasts, and in one case, a female guest's entire nude body, was indecent).

Defendants purport to bolster their argument to the contrary with a comparison of scenes from broadcasts that the Commission held were not indecent. *See* Defs. Mot. at 16-18. Such comparisons, however, only highlight the "highly fact-specific" nature of an indecency determination and thus, even if relevant to this proceeding, could not form the basis of a motion to dismiss. Indeed, as the Commission has emphasized – and the Supreme Court has endorsed – "[i]n determining whether material is patently offensive, the *full* context in which the material appeared is critically important," and such "contextual determinations are necessarily highly fact-specific." *Industry Guidance*, 16 FCC Rcd at 8002-03 ¶ 9; *see also Pacifica*, 438 U.S. at 750, 742 (recognizing that "context" is "all-important" in indecency determinations and therefore "cannot be adequately judged in the abstract"). Moreover, Defendants' comparisons of the material in the *Married by America* episode with scenes from the *Austin Powers* movie,[15] *Will*

---

[15]  The complained-of scene in *Austin Powers* involved a "musical number during which the title character's naked torso and genital area are blocked by objects, furniture, and, in one instance, by his hands." *Matter of Complaints by Parents Television Council Against Various Broadcast Licensees Regarding Their Airing of Allegedly Indecent Material*, 20 FCC Rcd 1920, 1923 ¶ 6(g) (2005). The Commission found that the material was not "sufficiently graphic or explicit, or sustained, to rise to the level of being patently offensive." *Id*. at 1927 ¶ 9.

and Grace,[16] Monday Night Football,[17] and Buffy the Vampire Slayer[18] ignore their critically

different contexts.  Thus, on this record, there is no basis for a determination as a matter of law

that the Married by America episode was not indecent.

> ## B.    Defendants' Violations Do Not as a Matter of Law Need to Be Predicated on a Complaint of a "Bona Fide" Viewer.

Defendants also erroneously contend that the Complaint should be dismissed because "it

does not allege that the FCC received any complaints about the episode from any members of the

public who actually watched the episode at issue."  Defs. Mot. at 19.  Defendants do not dispute

that the Commission received complaints from persons residing in the markets served by

---

[16] The complained-of episode in *Will and Grace* was alleged to have included a scene in which "[a] woman photographer passionately kissed [a] woman author and then humped her (what she called a 'dry hump.')."  *Matter of KSAZ License, Inc.*, 19 FCC Rcd 15999, 15999 ¶ 1 (2004). The Commission found that it was "not clear that the material . . . depict[ed] sexual activities," *id*. at 16001 ¶ 4, but determined, in any event, that the material was "not sufficiently explicit or graphic to be indecent, since "[b]oth characters are fully clothed, and there is no evidence that the activity depicted was dwelled upon, or was used to pander, titillate or shock the audience," *id*. at 16001 ¶ 6.  *See* Forfeiture Order ¶ 13 n.17.

[17] The *Monday Night Football* scene showed an actress "from the back, nude from the waist up," leaping into a football player's arms.  *Matter of Complaints Against Various Television Station Licensees Regarding the ABC Television Network's November 15, 2004, Broadcast of "Monday Night Football,"* 20 FCC Rcd 5481, 5481 ¶ 2 (2005).  The Commission concluded that while "the scene apparently is intended to be titillating, it simply is not graphic or explicit enough to be indecent under our standard."  *Id*. at 5483 ¶ 8.

[18] The *Buffy the Vampire Slayer* episode contained "a scene depicting Buffy kissing and straddling" another character "shortly after fighting with him."  *Matter of Complaint Against Various Broadcast Licensees Regarding Their Airing of the UPN Network Program "Buffy the Vampire Slayer" on November 20, 2001*, 19 FCC Rcd 15995, 15998 ¶ 6 (2004).  After reviewing the scene, the Commission found that it was not "sufficiently graphic or explicit to be deemed indecent."  *Id*.; *see also* Forfeiture Order ¶ 14 n.21 (observing that "[t]he 'Buffy' scene depicted two fully-clothed actors ostensibly fighting one another, whereas the instant case . . . featured sexually oriented entertainment performed by partially clad strippers").

Defendants' stations. *See* Defs. Mot. at 22.[19]  Rather, Defendants suggest that the requirement of

a bona fide viewer complainant "is both implicit in the statutory scheme and critical to the

constitutionality of the FCC's regulation of indecency." *Id*. at 20.  That suggestion is unfounded.

As an initial matter, as Defendants admit, the Commission's use of complaints as

triggering mechanisms for indecency determinations is a mere "enforcement principle."  Defs.

Mot. at 20.  It is well settled that "charging decisions" like the Commission's decision to issue a

Notice of Apparent Liability or the United States' decision to file the instant action are generally

not subject to judicial review.  *See Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157

(D.C. Cir. 2006).  Moreover, nothing in the indecency or forfeiture statute or the Commission's

indecency regulation requires as a condition precedent to the Commission's indecency finding

that a complaint be filed (much less one stating that the complainant watched the show).  Indeed,

neither the statutes nor the regulation references complaints at all.  *See* 18 U.S.C. § 1464; 47

U.S.C. § 503; 47 C.F.R. § 73.3999(b).[20]

Nor is there any basis for concluding that the First Amendment imposes any such

pleading requirement.  As a matter of enforcement discretion, the Commission "limit[s] the

---

[19]  Defendants apparently concede that the complaint filed against Tampa station (WTVT) alleges that the complainant watched the show.  *See* Defs. Mot. at 22.

[20]  The Commission's *Industry Guidance*, which Defendants cite, (Defs. Mot. at 20), states only that a complaint must "generally include" documentation such as transcripts or program excerpts, the date and time of the broadcast, and station call signs, *Industry Guidance*,16 FCC Rcd at 8015 ¶ 24, and is "usually" dismissed if it lacks such information, *id*. at ¶ 25.  The purpose of those requirements is to "afford[ *the Commission*] as full a record as possible to evaluate allegations of indecent programming."  *Id*. at ¶ 24 (emphasis added).  In this case, the complaints about *Married by America* provided the Commission with sufficient information to identify the show, the relevant episode, and the licensees responsible, and gave a clear basis for further investigation.  No more was required.

27

imposition of forfeiture penalties to licensees whose stations serve markets from which specific complaints were received." Forfeiture Order ¶ 38; *see also Omnibus Order*, 21 FCC Rcd at 2673 ¶ 32, 2676 ¶ 4, 2687 ¶ 86. The Commission does so "in light of First Amendment values" and to "preserve[] limited Commission resources," while at the same time "vindicating the interests of local residents who are directly affected by a station's airing of indecent . . . material." *Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, Order, 21 FCC Rcd 13299, 13329 ¶ 76 (2006) ("*Omnibus Remand Order*"). The Commission does not, however, require complainants "to specifically mention a station's call letters" or state that the complainant viewed the complained-of show; instead, "it is sufficient that viewers in markets served by each of the . . . [s]tations file[] complaints with the Commission identifying the allegedly indecent program broadcast." *Super Bowl Reconsideration Order*, 21 FCC Rcd at 6665 ¶ 30. The balance struck by the Commission's forfeiture policies take appropriate account of the need for restrained enforcement under the First Amendment, while at the same time satisfying the Commission's statutory responsibilities to ensure that indecent material is not broadcast in violation of federal law. In any event, whatever restraint the First Amendment imposes on the Commission's enforcement policies cannot possibly extend to the specific pleading requirement Defendants would impose as a constitutional matter – that indecency complaints filed with the Commission state that the complainant has actually viewed the broadcast in question. Defendants' arguments to the contrary are without merit.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny

Defendants' Motion to Dismiss.

Date:  August 1, 2008                    Respectfully submitted,

                                         GREGORY G. KATSAS
                                         Assistant Attorney General
                                         Civil Division

                                         JEFFREY A. TAYLOR
                                         United States Attorney

                                         ARTHUR R. GOLDBERG
                                         Assistant Director
                                         Federal Programs Branch

                                         /s    Jacqueline Coleman Snead
                                         JACQUELINE COLEMAN SNEAD
                                         (D.C. Bar No. 459548)
                                         ERIC B. BECKENHAUER (Cal. Bar No. 237526)
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Avenue N.W., Room 7214
                                         Washington, D.C.  20530
                                         Tel:  (202) 514-3418
                                         Fax: (202) 616-8470
                                         Email: jacqueline.snead@usdoj.gov

                                         **Attorneys for the United States of America**

29

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 08-584(PLF)** |
| **FOX Television Stations, Inc.,**<br>    **Licensee of Stations KMSP-TV,**<br>    **WJBK(TV), and WTTG(TV)**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC  20016,** | **PROPOSED ORDER** |
| **WDAF License, Inc.,**<br>    **Licensee of Station WDAF-TV**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC  20016, and** | |
| **TVT License, Inc.,**<br>    **Licensee of Station WTVT(TV)**<br>    **5151 Wisconsin Ave. NW**<br>    **Washington, DC  20016,** | |
| **Defendants.** | |

Upon consideration of Defendants' Motion to Dismiss, the Opposition thereto, and the complete record in this case, it is hereby

ORDERED that Defendants' Motion is DENIED.

Date: _____

_____
United States District Court Judge

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of August 2008, I caused a copy of the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss to be filed electronically and that the document is available for viewing and downloading from the ECF system.

/s/Jacqueline Coleman Snead_____
JACQUELINE COLEMAN SNEAD