## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Fox Television Stations, Inc., Licensee of Stations | ) | Civil Case No. 1:08-cv-00584-PLF |
| KMSP-TV, WJBK (TV), and WTTG (TV), | ) | |
| Defendants. | ) | |
| | ) | |

Thomas B. North, Attorney

Decency Enforcement Center for Television

1387 N. State St., #11

St. Ignace, MI 49781

(906) 643-6348

### MOTION FOR LEAVE TO FILE AMICUS CURAIE BRIEF

Decency Enforcement Center for Television, moves this Honorable Court for an order granting it leave to file an amicus curaie brief in this case, in support of Plaintiff, and limited to the constitutional issues, for the pending Motion to Dismiss and for trial, and in support of this motion, states:

1. Decency Enforcement Center for Television (acronym: Decent TV) is a Michigan nonprofit corporation.

2. This is a civil action in which Plaintiff is seeking to enforce a monetary forfeiture imposed by the Federal Communications Commission against Defendants.

3. Defendants have filed a Motion to Dismiss, and Plaintiff's response is due August 1, 2008. In that motion, Defendants attempts, among other arguments, to claim that the statute upon which the monetary forfeiture was based, 18 U.S.C. 1464, and the FCC regulations pursuant to that statute, are unconstitutional.

4. The corporate purpose of Decent TV is expressly to legally defend and advocate enforcement and established constitutionality of public decency laws, especially those for television, particularly by the filing of amicus briefs in pertinent federal court cases.

5. This motion is supported by the Memorandum of Points and Authorities attached and filed with it.

6. Undersigned counsel Thomas B. North has conferred by telephone with counsel for Defendants and the motion is not opposed.

Decency Enforcement Center for Television requests leave to file an amicus brief in support of Plaintiff for the pending Motion to Dismiss, and for trial.

Date: August 4, 2008

Thomas B. North

1387 N. State St., #11

St. Ignace, MI 49781

Date: August 4, 2008

Christopher T. Craig

6862 Elm St.

Ste. 360

McLean, VA  22101

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Fox Television Stations, Inc., Licensee of Stations | ) Civil Case No. 1:08-cv-00584-PLF |
| | ) |
| KMSP-TV, WJBK (TV), and WTTG (TV), | ) |
|                         Defendants. | ) |
| | ) |

Thomas B. North, Attorney

1387 N. State St., #11

St. Ignace, MI 49781

(906) 643-6348

## MEMORANDUM OF POINTS AND AUTHORITIES

## IN  SUPPORT OF MOTION FOR LEAVE TO FILE

## AMICUS  CURAIE  BRIEF

Decency Enforcement Center for Television (hereafter, by its acronym, "Decent TV"), by and through its attorneys Thomas B. North and Christopher T. Craig, submits this Memorandum in support of its Motion for Leave to File Amicus Brief.

This is a civil action in which Plaintiff United States of America is seeking to enforce collection of a monetary forfeiture imposed by the Federal Communications Commission (hereafter, "the Commission") against Defendants Fox Television Stations, et al, for airing an indecent television broadcast prior to 10 p.m. in violation of Commission regulations. Defendants have filed a Motion to Dismiss, and Plaintiff's reply is due August 1, 2008.

Defendants assert in their motion that Plaintiff has failed to state a cause of action upon which relief can be granted, and make several arguments in support of that motion. Some of those arguments attempt to persuade this Court that it should find that the statute underlying the Commission regulations, 18 U.S.C. 1464, in its prohibition of indecent broadcasts, has somehow become unconstitutional, despite the fact that the U.S. Supreme Court, in *FCC v Pacifica Foundation, 438 US 726 (1978)* made the permanent finding that the statute is constitutional in that regard, and that every lower federal court that has addressed the issue has made the same finding.

Decent TV is a Michigan based non profit, IRC section 501 c 3 corporation founded for the expressly stated purpose of legally defending and advancing enforcement of public decency laws, especially those for television. Recognizing that it is the primary core function of the Commission to enforce 18 U.S.C. 1464, Decent TV engages in such legal advocacy from the

2.

perspective of the American citizen/viewer, primarily through filing amicus curaie briefs in federal court cases in which the established constitutionality of broadcast decency laws is sought to again be challenged, when there is no legal authority that allows the issue to be revisited.

Because Defendants are asking this Court to exceed its power and overrule the U.S. Supreme Court and U.S.Courts of Appeals, it is necessary for Decent TV, in keeping with its corporate purpose, to attempt to file an amicus curaie brief in this case. Decent TV could await the outcome of the case in this Court, recognizing that it is a trial level court, and amicus curaie briefs are not customarily filed routinely, and instead file an amicus curaie brief only in the U.S. Court of Appeals in the certain event of an appeal if this Court were to commit the error of finding the statute unconstitutional. But this statute is so crucial to American life, that it warrants seeking leave in this Court. The proposed amicus curaie brief is for purposes of both the Defendants' Motion to Dismiss, and the trial on the merits of this matter later. The amicus brief would be limited in scope to the purported constitutional issues sought to be raised.

While the Federal Rules of Civil Procedure and local rules of this Court do not expressly provide for the procedure of filing an amicus curaie, they do not preclude them, either. The Supplement to the Local Rules of this Court, found on this Court's website, specifically lists Motions for Leave to File an Amicus Curaie Brief as unable to be filed using the Court's ECF system, and provides an alternate means of filing this specific type of motion (II. F.2. i. in Supplement outline). Obviously, such motions may be filed, leading to a belief that they are sometimes granted, and this Motion is based on that authority.

Undersigned counsel Thomas B. North telephoned a docket clerk for the judge assigned to this

3.

case, and was given confirmation that the filing of a motion is the proper procedure for seeking leave to file an amicus brief.

Decent TV seeks leave to file an amicus curaie brief in this Court because, while having faith in the competency of the U.S. Solicitor General's office to defend against the Motion to Dismiss their complaint, it cannot be assumed that they will raise all possible responses to Defendants' constitutional arguments. Decent TV approaches the case from a different perspective, that of the American citizen/viewer, in terms of how crucial 18 U.S.C. 1464 is to any quality of life in this nation, by protecting children and unconsenting adults from unchosen and unwanted exposure to indecency via their own public airwaves, into the sanctity of their very homes, and into all public places. Therefore, it is necessary to do everything possible to emphasize to any court that may have occasion to consider such issues that there is no legal authority for revisiting the U.S. Supreme Court's holding in *Pacifica, supra* that the statute is constitutional.

The proposed amicus curaie brief of Decent TV, if allowed by the Court to be filed, would, in addressing Defendants' constitutional arguments, advance in more detail the following specific counter arguments:

1.   As stated above, the U.S. Supreme Court, as well as lower federal courts, have on every occasion of addressing the issue, found the restriction on indecent broadcasts in 18 U.S.C. 1464 to be permanently constitutional. This Court lacks power to overturn U.S. Supreme Court legal precedent, especially in a procedural motion hearing. Further, as recently as July 21, 2008, the U.S. Court of Appeals for the Third Circuit, in Case No. 06-3575, the infamous Janet Jackson Super Bowl Halftime case, decided

4.

"The FCC's authority to restrict indecent broadcast content is nevertheless constitutionally permissible because of the unique nature of the broadcast medium."

2.  As stated above, there is no legal authority for Defendants' proposition that the U.S. Supreme Court holding in *Pacifica, supra,* can be revisited. The subsequent fact that Defendants entirely rely upon, the development of a "V-chip", does not provide a legal basis to reconsider established constitutionality of a statute; at most, there may be a statutory conflict for Congress to consider.

3.  A Motion to Dismiss for failure to state a claim upon which relief can be granted cannot be based legitimately on an argument that the statutory basis of the Complaint is unconstitutional, when the case law is to the contrary. Plaintiff's Complaint is based on the current law, and therefore does state a claim upon which relief can be granted, regardless of any argument of Defendants that the courts should prospectively revisit *Pacifica, supra,* based on a factual development since the year that case was decided. The Third Circuit decision quoted above is a higher court affirming most recently that this cause is constitutional.

4.  Contrary to Defendants' assertion, the federal courts have found that the Commission's definition of "indecency" is not unconstitutionally vague.

5.  Broadcast television and radio remain uniquely accessible to children, as the U.S. Supreme Court found in 1978 in *Pacifica, supra,* and any argument or finding to the contrary is based on a complete lack of understanding of the "pervasiveness" leg on the *Pacifica,* which had nothing to do with comparisons to other media or forms of entertainment or communication, and everything to do with the nature itself of the

5.

medium of broadcasting via the publicly owned airwaves into every place in the nation.

6.  The Commission is legally bound and mandated to decide matters and act based on

the laws passed by Congress, and the federal case law, and not as Defendants would

have them do, by ignoring the law and acting based on a factual development, i.e., the

"V-chip", that has no legal significance.

7.  The Commission's regulations under 18 U.S.C. 1464 remain the least restrictive

means of achieving the government's compelling interest in assisting unconsenting

adults in protecting their children and themselves from unwanted broadcast

indecency.

8.   Defendants' reliance on the *Sable, Playboy, Reno and Ashcroft* line of cases is

completely misplaced, and none of those cases are relevant as precedent in this case,

because of each of the following:

    A.   All of those cases were cases on first impression for the U.S. Supreme

    Court, unlike broadcast media, as to which *Pacifica* has already engaged

    in a legal "means" analysis and established constitutionality.

    B.   All of those cases were decided using a "strict scrutiny" standard, which

    the U.S. Supreme Court has held cannot be used in public broadcast media

    cases.

    C.   All of those cases were based on express findings that there was

    technology that was "reasonably effective", whereas there has never been

    such a legal finding by any court as to the "V-chip" for broadcast

    television, and in fact, the "V-chip" in ineffective and worthless, partly

6.

    due to Defendant Fox and other television broadcast networks complete
control of its operation through the ratings and active circumvention of its
effectiveness.

D.  The *US v Playboy, 529 US 803 (2000)* holding was expressly based also
on the blocking technology being provided to the customer free of charge
by the provider within twenty four hours of request by a free telephone
call, and therefore, that case can only begin to be applicable if Defendant
Fox and all broadcast networks provide V-chips free of charge to all
America citizens within twenty four hours after a request by a free
telephone call, something that is probably impossible and certainly not
done currently.

E.  All of the aforesaid cases involved speech through a private wire (cable,
phone line, or computer line) owned by the provider and to which the
customer has subscribed, as to which government regulation has been
suspect.  This case involves the licensed privilege (not right) to use the
public broadcast airwaves owned not by Defendants or any broadcaster,
but by the government, which is charged with regulating them  in trust for
the nation's citizens, without subscription. Further, the aforesaid cases
involve customers having to dial or log into phone numbers, channels or
sites out of hundreds or thousand available, rather than, as found in
*Pacifica,* constantly tuning in and out of a small handful of broadcast
channels, which makes accidental exposure more likely. These basis facts

underlie every First Amendment analysis.

9. The *Denver Area ETC v FCC* case cited by Defendants is also inapplicable because it was a cable television case, not a broadcast television case, and did not involve "V-chips" at all, which is the term specifically applied to the blocking technology for broadcast television only, and which operates completely differently than cable blocks.

10. The "V-chip" for broadcast television cannot possibly provide any basis for finding 18 U.S.C. 1464 unconstitutional, when that Act applies primarily to broadcast radio, for which there is no "V-chip" or other blocking technology in existence. A court finding that the statute is unconstitutional would leave broadcast radio listeners without any protection, as there would be no law and no blocking technology.

11. The "V-chip", relied on entirely by Defendants in their constitutional arguments, does not exist in the televisions of many citizens, i.e., older televisions, and new televisions under thirteen inches in screen size (most of which end up in childrens' bedrooms). Further, many satellite television subscribers do not take their broadcast channels through their satellite systems, or have older satellite systems, so that they do not all have blocking technology, as Defendants' arguments assume. There are over 30 million Americans who do not have any blocking technology, and the law does not permit a burden to be placed on them to obtain it to avoid indecency. Further, citizens do not have control to program the "V-chips" in televisions in public places they go to, such as restaurants, schools, lodging places, stores, etc., but yet, as the Supreme Court has found, do not have a legal burden to absorb indecency in those places.

8.

12. The "V-chip", unlike the technologies in the *Sable, Playboy, Reno and Ashcroft* cases, rely on ratings. The ratings are assigned by Defendant Fox and the other networks, with no accountability, and not all programs are rated. Defendant Fox and the other networks completely control the "V-chip" through the ratings, not the parent or viewer, and there is uncontroverted evidence that the networks deliberately mis-rate programs at least 68% of the time as being suitable for children younger than the objective criteria states (not "occasionally" as argued) in order to avoid losing advertiser revenue from lower ad rates. Defendants tacitly admit this in their Motion to Dismiss, incredibly claiming that these facts "cast no doubt on whether the "V-chip" is effective". Further, the "V-chip" does not permit the parent to block "all objectionable programming" as claimed by Defendants; rather, they can only block the less than 30% of programs that are assigned a rating that is accurate.

13. The Commission is not legally bound to predictions about the "effectiveness" of the "V-chip" that it made in a report prior to its usage being commenced. Particularly, it was not possible for the Commission to anticipate that the operation and effectiveness of the "V-chip" would be circumvented, manipulated, and gutted by the mis-ratings by the networks, including one of these Defendants, Fox Television, who now, after rendering it an abysmal failure, want the "V-chip" to replace the statute legally.

14. 18 U.S.C. 1464 is the only means of achieving the government's interest that is not entirely within the control of Defendants and the other broadcasters, the adversaries of the Commission and the American people in this case, and is the only protection citizens have from Defendants and the other broadcasters from indecency.

9.

15. The argument of Defendant that viewers can use a "V-chip" to block unwanted programming, rendering the statute unconstitutional, is legally identical to the argument rejected by the U.S. Supreme Court in *Pacifica* that radio listeners can block unwanted broadcasts by use of the channel or on/off buttons, except that unlike the channel/power buttons on all televisions/radios, there are not V-chips on all television, making the current argument even weaker than that advanced by Pacifica Foundation in 1977. This is another reason why the V-chip does not give cause to revisit Pacifica; the Supreme Court permanently rejected all technology as a substitute for the statute regulating broadcasts at the source.

16. Over the past seventy plus years, all American citizens consciously or subconsciously have come to rely completely upon 18 U.S.C. 1464 in their lives as protection from indecency in their homes and as they go about in all public places. Decency is the norm, not the exception, in a civilized society, and always will be.

It cannot be assumed that the U.S. Solicitor General's office will necessarily raise every one of the foregoing sixteen arguments that it is critically necessary to the lives of all Americans be considered by this Court, if it even entertains Defendants' constitutional arguments. Any one of these arguments is sufficient in and of itself to defeat Defendants' constitutional issue.

Wherefore, Decency Enforcement Center for Television moves for leave to file an amicus curaie brief in support of Plaintiff, limited to constitutional issues, for Defendants' Motion to Dismiss, and for trial.

10.

Attorneys for Decency Enforcement Center For Television

Date: August 4, 2008

Thomas B. North

1387 N. State St., #11

St. Ignace, MI 49781

(906) 643-6348

Date: August 4, 2008

Christopher T. Craig

6862 Elm St.

Ste. 360

McLean, VA 22101

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Fox Television Stations, Inc., Licensee of Stations | ) Civil Case No. 1:08-cv-00584-PLF |
| | ) |
| KMSP-TV, WJBK (TV), and WTTG (TV), | ) |
| Defendants. | ) |
| | ) |

Thomas B. North, Attorney

1387 N. State St., #11

St. Ignace, MI 49781

(906) 643-6348

### AMICUS CURAIE BRIEF
### OF DECENCY ENFORCEMENT
### CENTER FOR TELEVISION
### IN SUPPORT OF PLAINTIFF

Decency Enforcement Center for Television (hereafter, by its acronym, "Decent TV"), by and

through its attorneys, Thomas B. North and Christopher T. Craig, submits this Amicus Curaie

Brief, in support of Plaintiff, for the pending Motion to Dismiss, and for later trial on the merits.

1.

**FACTS**

This is a civil case in which the Plaintiff, United States of America, has filed its Complaint

seeking to enforce a monetary forfeiture imposed by the Federal Communications Commission

(hereafter, "the Commission") against Defendants Fox Television Stations, Inc., Licensee of

KMSP-TV, WJBK (TV), and WTTG (TV) for the broadcast of an indecent television program

in violation of federal statute and the Commission's regulations pertaining to broadcasting.

Defendants have filed a Motion to Dismiss the Complaint. Plaintiff's reply was filed August 1,

2008. Defendants' Motion to Dismiss is made on the purported grounds that the Complaint fails

to state a cause of action upon which relief can be granted legally.

**INTEREST OF THE AMICUS CURAIE**

Amicus Curaie Decent TV is a Michigan based nonprofit corporation, with IRC 501 c 3 status,

founded for the expressly stated purpose in its Articles of Incorporation of legally defending and

enforcing public decency laws, especially those for television.  Recognizing that it is the

primary core function of the Commission to enforce the federal statute and its regulations,

Decent TV engages in legal advocacy by filing amicus curaie briefs in federal court cases and

consulting with other organizations, from the perspective of the American citizens who are

broadcast television and radio viewers and listeners.


Because  Defendants  in their Motion to Dismiss make several arguments attempting to persuade

this Court that the federal statute restricting broadcast indecency, 18 U.S.C. 1464, has somehow

become unconstitutional, it became necessary for Decent TV, in keeping with its corporate

purpose, to move for leave of this Court to file an amicus curaie brief. Recognizing that this is a

2.

trial level court, and that the filing of amicus curaie briefs is not common, although not

prohibited or unheard of, Decent TV could have awaited the outcome of the case, and only

filed an amicus curaie brief in the U.S. Court of Appeals in the event this Court erred by finding

the statute unconstitutional. But the aforesaid statute is so critical to American life, and the

challenge to it so unfounded legally and factually, that it warrants the filing of an amicus brief at

the outset, in this case in this Court. This Amicus Curaie Brief is limited in scope to addressing

the constitutional arguments made by Defendants in their Motion, and not the other arguments

they have been advanced particular to the television program in question.


This Amicus Curaie Brief is filed pursuant to a Motion for Leave to File the same that is

pending, with court direction to go ahead and lodge the brief. Decent TV sought to file this

Amicus Brief, because, while having faith in the ability of the U.S. Solicitor General's office to

defend against the motion seeking to dismiss their Complaint, it cannot be expected that they will

raise or all possible responses to Defendants' constitutional arguments. It is necessary for

Decent TV to do everything possible to emphasize to any court that may even consider finding

18 U.S.C. 1464 unconstitutional, that it is palpable legal error to do so, there is no factual basis to

do so, and how crucial that statute is to all quality of life in this nation, by being the sole

protection for children and unconsenting adults from unchosen and unwanted exposure to

indecency via their own public airwaves into the sanctity of their homes and into all public

places.

3.

**ARGUMENTS**

I.    THIS HONORABLE COURT LACKS ANY LEGAL POWER TO FIND 18 USC

1464 UNCONSTITUTIONAL, ESPECIALLY IN A PROCEDURAL MOTION

HEARING, DUE TO PERMANENTLY ESTABLISHED PRECEDENTS TO THE

CONTRARY BY THE U.S. SUPREME COURT AND COURTS OF APPEALS.

With all due respect, this is a U.S. District Court that is bound by precedential holdings of the

U.S. Supreme Court and U.S. Courts of Appeals. Further, Defendants are asking this Court to

make the impossible leap of not only overturning the Supreme Court and Courts of Appeals, they

are asking this Court to do so in the course of deciding a procedural motion to dismiss. This

Court simply lacks any power or authority to do what Defendants ask it to do. Instead, it is oath

and duty bound to uphold the law, which includes the precedents of the higher courts, not upset

it.

Particular to the subject matter of this case, on the one occasion that it addressed the issue of

restriction of broadcast indecency, the U.S. Supreme Court in *FCC v Pacifica Foundation, 438

US 726 (1978)* found 18 U.S.C. 1464 to be constitutional. The statute has not been amended

since. In addition, on every single occasion in which they have addressed the issue, the U.S.

Courts of Appeals have likewise found the same statute to be constitutional in its indecency

provisions. As recently as July 21, 2008, the U.S. Court of Appeals for the Third Circuit, in Case

No. 06-3575 (the infamous Janet Jackson Super Bowl halftime show case) decided, "The

4.

FCC's authority to restrict indecent broadcast content is nevertheless constitutionally permissible because of the unique nature of the broadcast medium."

II.    DEFENDANTS IN THEIR MOTION TO DISMISS HAVE NOT MET THEIR BURDEN OF CITING ANY LEGAL AUTHORITY THAT WOULD PERMIT THE SUPREME COURT'S HOLDING IN *PACIFICA, SUPRA* TO BE RE-VISITED.

Defendants are moving for this Court to dismiss the Complaint, and as the moving parties, have the burden of citing legal authority to support their motion. In light of their arguments that 18 U.S.C. 1464 is unconstitutional, and the U.S. Supreme Court's holding in *Pacifica, supra,* that 18 U.S.C. 1464 is constitutional, Defendants' have a burden of citing at the very least, some legal authority for their proposition that the Supreme Court's finding of constitutionality can be re-visited at all, for any reason, and is anything less than permanent. But they have not.

If, since *Pacifica, supra,* was decided in 1978, there had been some amendment of the statute, or an amendment of the First Amendment in accordance with the provisions in the U.S. Constitution, this may be a case of first impression. But it is not. The constitutionality of the statute is established. As a nation, we have "been there, done that." Defendants as moving parties have not met their burden of citing any legal authority for their proposition that a subsequent factual event, such as development of a technology, e.g., the "V-chip", somehow provides some legal basis to revisit the established constitutionality of a statute. Defendants' argument in that regard is a blatant attempt to persuade this court to engage in a gross form of judicial activism by

5.

trying to apply the facts to the law, rather than applying the established law to the facts. In the United States, with the U.S. Constitution as the foundation, we have a form of government in which the facts are subservient to the law, not vice versa.

III.     THERE IS NO NECESSITY FOR THIS COURT TO ADDRESS OR DECIDE A
         CONSTITUTIONAL ISSUE.

Since adoption of the broadcast indecency provisions in 18 U.S.C. 1464, there has been a technological advent commonly known as the "V-chip." This is for broadcast television only, and neither this case or the "V-chip" have anything to do with cable or satellite television , which are not regulated by government in terms of content, since they do not use the airwaves. Congress enacted legislation that mandated that "V-chips" be incorporated into larger television sets manufactured for sale in the U.S. in recent years. Defendants are now arguing that the "V-chip" is an adequate blocking mechanism, and that the statute is now unconstitutional.

Congress' intent in enacting the "V-chip" legislation, which courts are legally bound to defer to, was that it would compliment and supplement the existing indecency statute and rules for broadcast television.  Due to the outcry from the general public about the ever increasing amounts of broadcast television indecency, Congress acted in this way to provide parents and viewers with one MORE tool of protection, to be used in conjunction with the indecency statute, not in place of it.  In the legislative process, Congress and the then-President frequently and

6.

clearly repeated this intent in public. This intent has been borne out by Congress just in 2006 overwhelmingly passing legislation clamored for by the American public, to vastly increase the dollar amounts of fines for violation of the indecency statute.

Even if a court were to act contrary to this clear legislative intent by finding some kind of conflict between the older indecency statute and the recent "V-chip" legislation, the impact is, at most, a legislative issue for Congress to resolve. Defendants can more legally and easily request a Congressman or Senator to initiate some legislative procedure to resolve any conflict, than to request relief from the court on a legislative matter.

There is no such issue at all for the judicial branch of government, and certainly not a constitutional crisis. The enactment of the "V-chip" legislation by Congress of its own volition did not create one. In fact, if any governmental body (legislative or judicial) were to determine that one or more laws in this field have to be stricken, it is most logical and sensible for Congress to repeal the narrower "V-chip" legislation, given the "V-chip"s history of complete failure, to be argued later.

IV.    A CLAIM UPON WHICH RELIEF CAN BE GRANTED HAS BEEN STATED
       WHEN THE CASE LAW HOLDS THAT THE STATUTE UPON WHICH IT IS
       BASED IS CONSTITUTIONAL.

As stated above, the federal courts have always consistently held that 18 U.S.C. 1464 is

constitutional. The Plaintiff's Complaint is based on that statute, the Commission's regulations promulgated under it, and that case law. Defendants' are arguing that *Pacifica, supra,* be revisited prospectively, based solely on the advent of the "V-chip" and the ratings upon which it is based. For all of the arguments and reasons set forth in this Amicus Brief, Defendants' arguments are critically flawed in many respects. But even for the sake of discussion, if there were some merit to Defendants' constitutional arguments for a prospective change of the law, the laws that Plaintiff's claim is based upon had been held to be constitutional and were the current law at the time of the broadcast of the particular television program in question. Therefore, as of the pertinent time frame, Plaintiff's Complaint must state a legal claim upon which relief can be granted. Defendants' in essence are arguing that they do not have to abide by any law as long as they can later come into court and argue that the statute under which they are being sued should be prospectively held to be unconstitutional, based on some factual development. But the factual development they cite, the "V-chip", has never been assigned any legal significance that can be relied upon to defend a legal cause of action. This Court must decide such matters in accord with the law that exists at the time, not what someone thinks the law should become.

V.    CONTRARY TO DEFENDANTS' ASSERTIONS, THE U.S. COURT OF
      APPEALS HAS FOUND THE COMMISSION'S DEFINITION OF 'INDECENT'
      IS NOT UNCONSTITUTIONALLY VAGUE.

Defendants argue that the Commission's definition of "indecent" is unconstitutionally vague, and that no federal court has ever found otherwise. To the contrary, the U.S. Court of Appeals for the D.C. Circuit in *Action for Childrens' Television v FCC,* 852 F.2d 1332 (1988), Judge (now

Supreme Court Justice) Ruth Ginsburg writing for the majority, upheld the Commission's definition against vagueness and overbreath challenges. Defendants are incorrect.

VI.    BROADCAST TELEVISION AND RADIO REMAIN UNIQUELY PERVASIVE AND ACCESSIBLE TO CHILDREN , AND ARGUMENTS TO THE CONTRARY ARE BASED ON A LACK OF UNDERSTANDING OF THE "PERVASIVENESS" LEG OF *PACIFICA, SUPRA.*

The U.S. Supreme Court determined in *FCC v Pacifica Foundation, 438 US 726 (1978)* that it is the law of this nation that broadcast mediums have a unique pervasiveness and accessibility, to children in particular. No one has claimed that is any different for television than it is for radio. Those findings of the Supreme Court are the last word and are permanent. Also, as stated earlier, the U.S. Court of Appeals for the Third Circuit just on July 21, 2008, affirmed this pervasiveness of the broadcast medium in a television case.

Defendants argue that broadcasting is less pervasive now than it was in 1978 when *Pacifica, supra* was decided. (To be fair, their motion was filed prior to the July 21, 2008 Court of Appeals decision that refutes their motion). This argument is based on the proliferation of other forms of non-broadcast media that citizens now generally have the choice of purchasing, such as cable/satellite television, internet, cell phones, etc.

However, the Defendants' argument in that regard is based on an apparent complete lack of

9.

understanding of the "pervasiveness" leg of the *Pacifica* decision. Defendants argue "pervasiveness" to mean that in 1978, broadcast television and radio were the only electronic means of receiving television or radio. They treat "pervasiveness" as the level of exclusivity of one medium in comparison to all other forms of media. Therefore, they argue on an assumption that as new forms of media develop, or indeed, anything new that might distract people from viewing or listening, broadcasting becomes less "pervasive."

But that is not what the term "pervasiveness" means at all, and was certainly not how the Supreme Court was using it in *Pacifica, supra,* as a basis for its decision. This is clear from a mere reading of the opinion.

"Pervasiveness", when used in a media issue, and as used by the Supreme Court in *Pacifica,* instead has everything to do with the nature itself of the individual medium, standing alone, and without regard to any other medium or source. Regardless of the development of cable and satellite television and radio, the internet, or anything else, broadcast television and radio are still THE television and radio sources that go out into not only EVERY home in America (regardless of whether there is a television or radio present there at a given moment to receive it), but also into EVERY place in America – every building and every outdoor place, too. Within every building, it also goes into EVERY room. That fact has not changed since since 1978 or since the advent of broadcast television, and never will. This is also without regard to whether any other medium is present in that same place. Cable and satellite television and radio, the internet, and other sources of media, to the contrary, only go where they are invited, usually by subscription.

10.

Broadcasting is also uniquely pervasive because it is free (there is no paid subscription) and requires nothing to install it. A portable battery powered television, for example, receives broadcasts anywhere within range of any station. Defendants ignore all of this as inconvenient to their arguments and agenda. Broadcast television and radio are different than all other forms of source of speech, and therefore, are reasonably treated differently by the law.

> VII.    THE COMMISSION IS BOUND TO ACT IN ACCORD WITH THE LAW,
> AND NOT IGNORE THE LAW IN FAVOR OF FACTUAL
> DEVELOPMENTS.

The Commission is legally bound and mandated to act and decide matters in accord with the laws passed by Congress and the federal case law. Defendants argue that the Commission should have acted as apparently Defendants would if in that position, and that is to completely ignore the law, and refrain from fining Defendants based on a factual development, the advent of the "V-chip", that has no legal significance. There is a pattern to Defendants' arguments, the thread of saying that the law is something to be completely ignored, disregarded and disobeyed, not only by themselves, but by the Commission and the courts. The pattern goes that anyone, whether it be a broadcaster, the Commission, or the courts, should be able to thumb their nose at the law, and instead base their actions subjectively on the current state of facts, particularly, a "V-chip". The argument then goes that the laws should be stricken down in favor of and due to this "V-chip." The reality is that the Commission is not a lawmaking entity. The Commission cannot legally decide to just ignore the laws that mandate its actions even if its members might personally think that the "V-chip" has some significance. Nor can the Commission decide the

11.

constitutionality of laws, as Defendants would have it do.  In our nation that is based on laws, not

facts, the Commission had no choice but to enforce the law passed by the American citizens

through their elected legislative representatives, and as upheld by the courts that interpret it.

VIII.    18 U.S.C. 1464, AND THE COMMISSION'S REGULATIONS,
CONSISTENT WITH THE CASE LAW, REMAIN THE LEAST
RESTRICTIVE MEANS OF ACHIEVING THE GOVERNMENT'S
COMPELLING INTEREST IN ASSISTING UNCONSENTING ADULTS
IN PROTECTING THEIR CHILDREN AND THEMSELVES FROM
UNWANTED BROADCAST INDECENCY.

*FCC v Pacifica Foundation, 438 US 726 (1978)* and the cases in the Courts of Appeals have

established that the legal "means" analysis applies in broadcast media cases. There is no legal

authority cited for any proposition that this can now be changed to a "strict scrutiny" analysis.  It

is the law that parents, broadcasters, and the government each have a role in assisting one

another in protecting children from indecency. In recent years, however, Fox Television and the

other major broadcast networks have actively tried to shirk any role or responsibility on their

part, and are now asking this Court to attempt to permanently eliminate the government's role,

trying to leave parents and children out there on their own, defenseless.  As any of the most

diligent and responsible parents can tell you, it is impossible for them to singlehandedly protect

their children from broadcast indecency without the help of the government. Any number of

scenarios make it even more impossible in given situations – single parents, working parents

(some with two, three, four jobs each), neglectful parents (whose children have as much right to

be protected by government as the children of diligent parents), any parent who allows their child to leave their home to go anywhere (like a friend's home) before they become an adult, etc. It bears reminding that in the U.S. every person under age 18 is legally a child, by unanimous definition. Parents have very little control over the accessibility of their children to broadcasting, especially outside the home, and as both children and broadcast technology get more mobile.

As sacred as homes are, as found in *Pacifica, supra,* the public airwaves go into many other places, like schools (for all school ages), day care centers, nursing homes, restaurants, lodging places of all kinds, stores (including department and electronic stores where banks of televisions are on for all shoppers to see), etc. Defendants fail to say how people who come and go from those places in public are to use a "V-chip" to protect their children and themselves from broadcast indecency in those places. It cannot be sanely argued by anyone that in a civilized society any private citizen or their child has to be subjected to even a slight risk of so much as a brief glimpsing or encountering indecency in the general public just by daring to leave home and go about their daily affairs. (This is opposed to other types of public places like movie theaters that may be open to consenting adults to enter to expressly view indecency). Nor does any government entity, including the judiciary have any authority to decide for private citizens that they must take that risk in public. In fact, the Supreme Court has not done that, but has done the opposite, by establishing as law that citizens are NOT subject to a first blow of absorbing indecency before they can turn away. *Pacifia, supra.* The public airwaves, by settled law, belong to the citizens, not the Defendants or other broadcasters, and are NO different than a public

13.

street, park, sidewalk, etc. The citizens have through their legislative representatives passed laws against indecency on their airwaves and have charged the Commission with enforcing them. The citizens have further charged the government with holding those public airwaves in trust for them and regulating them. In this case, Defendants are trying to do nothing short of eliminating any ability of the citizens to regulate their own public airwaves for their own protection from the broadcasters' indecency. But the public airwaves are different than all other forms of electronic media, which are by private wire or private wireless signal, as a private transaction between the provider who owns the cable or wire, and their paying customer. Defendants continually ignore this basic legal distinction.

> IX.    DEFENDANTS' RELIANCE ON THE *SABLE, RENO, ASHCROFT, AND PLAYBOY* LINE OF CASES IS ENTIRELY MISPLACED, AS NONE OF THOSE CASES ARE RELEVANT AS PRECEDENT IN THIS CASE, FOR NUMEROUS REASONS.
>
>> A.  The *Sable, Reno, Ashcroft, and Playboy* cases were all cases of first impression for the media involved in each, unlike the broadcast medium, as to which the U.S. Supreme Court has already engaged in a legal" means" analysis, and permanently established the statute as constitutional.

Defendants Motion Memorandum cites the cases of *Sable Communications v FCC, 492 US 115 (1989); US v Playboy Entertainment Co., 529 US 803(2000), Ashcroft v ACLU, 542 US 656 (2004) and Reno v ACLU, 521 US 844 (1997)* in an attempt to argue that

14.

there is now some sweeping edict from the Supreme Court that statutory regulation of speech at its source is unconstitutional when there is any form of blocking technology in existence, even if that technology is not 100% perfect.

There is no such sweeping edict, and the Supreme Court has never held that way. Each of the aforesaid cases involved the constitutionality of a non-broadcast form of media and technology, e.g., telephone, cable television, and internet (in two cases). Each of those cases represented the very first time the Supreme Court had addressed the constitutionality of a statute that attempted to place some type of restriction on the medium involved at its source. Each case was a case of first impression. In none·of those cases did the Supreme Court enter any decision or holding that went beyond the facts of the specific non-broadcast medium or blocking technology involved. The Supreme Court decisions in all of those cases were based on the particular case facts. Even in combination, as in all cases the Supreme Court struck down the statutes involved, there still cannot be discerned any general holding that can be applied to all statutory restrictions on speech at its source or all blocking technologies, much less to the broadcast media, to which none of the cases pertained. Defendants attempt to put words into the mouths of the Supreme Court justices by reading such a sweeping effect into the foregoing cases.

But even aside from anything else regarding that line of cases, we do not have to guess at

15.

whether it impacts the broadcast media. The Supreme Court in *Pacifica, supra* has already engaged in a legal "means" analysis for the medium, and held the statute involved, the same one in this case, is constitutional. Further, in some of the non-broadcast cases cited above, the Supreme Court took pains to make clear that their holding does not apply to broadcasting, which is legally treated differently.

        B.   The *Sable, Playboy, Ashcroft, and Reno* cases were all decided by the Supreme Court using a "strict scrutiny" analysis, which it held cannot be used in broadcast media cases for various reasons.

In *Sable, Playboy, Ashcroft, and Reno, all supra,* the U.S. Supreme Court employed a "strict scrutiny" analysis, which made the government's burden more difficult. The Supreme Court, however, in *Pacifica, supra* permanently established the lesser level of scrutiny and relaxed "means" analysis for broadcastin, partly to reflect its use of the public airwaves, and partly due to its pervasiveness, possibly among other reasons (as has been argued above). This alone renders the above line of four cases cited by Defendants as irrelevant to this broadcasting case. Defendants attempt to count apples as oranges by trying to apply their line of cases to broadcasting.

        C.   The *Sable, Playboy, Ashcroft, and Reno* cases were all decided based on express findings by the courts that the specific blocking technology present in each case was reasonably effective, unlike the "V-chip" relied upon by Defendants for broadcast television.

The courts' decisions in *Sable, Playboy, Ashcroft, and Reno, all supra*, including the decisions of the Supreme Court, were expressly based in each and every case on factual findings that the blocking technology available was "reasonably effective". Defendants argue that the *Playboy* decision does not require the technology to be "100% perfect". That is true, but the Supreme Court DOES require the technology to be "reasonably effective". There is a huge difference between not being "100% perfect" and not being "reasonably effective."

There has never been any finding by any court of law that the "V-chip" blocking technology for broadcast television is effective at all, much less "reasonably effective." In fact, the "V-chip" is ineffective and practically worthless, partly due to its operation being completely controlled and actively circumvented by Defendant Fox Television Stations and the other major television networks, as will be argued later. It is the burden of the party challenging constitutionality to prove "reasonable effectiveness" of the blocking technology they assert should take the legal place of direct regulation, and there is no evidence whatsoever of any actual effectiveness of the "V-chip", only overwhelming evidence of its utter ineffectiveness.

          D.   The *Playboy, supra* case is also distinguishable from this case for additional reasons.

The holding of the U.S. Supreme Court in *Playboy, supra,* was also expressly based on the blocking technology being provided to the customer free of charge by the provider

17.

within twenty four hours after a free telephone call to the provider, by statute. The Court

found that statute obviated the need for direct regulation of content. Defendants seek to

apply the holding of that case to this one. However, the holding of *Playboy* can really

only be applied to this case if there were a statute requiring Defendant Fox Television

and the other television broadcasters to provide a "V-chip" free of charge to every

American citizen/television viewer who requests one by a free telephone call, and to do

so within twenty four hours thereafter. There currently is no such statute, nor do any

broadcasters provide free blocking technology. Such a system is probably impossible for

broadcasting, and that impossibility works legally against Defendants, as the parties who

seek to replace direct regulation, and not in any way against Plaintiff as some kind of

excuse for Defendants to raise later. This is another reason why the *Playboy* holding

cited by Defendants is inapplicable to broadcasting.

> E.   Unlike broadcasting over the public airwaves, the *Sable, Playboy,*
> *Ashcroft, and Reno* cases all involved speech through a private cable or
> wire owned by the provider to a subscribing customer, as to which
> government regulation is more suspect.

The *Sable, Playboy, Ashcroft, and Reno, all supra,* cases each involved speech that is

provided through a private wire (cable, phone line, or computer line) that is owned by the

provider, and to which customers subscribe for a fee. These are private transactions

between entities and consenting adults. As to these types of transactions, government

regulation has always rightfully been more suspect.

18.

The instant case involves instead the licensed privilege (not right) of Defendants and other broadcasters to use the broadcast airwaves owned not by Defendants or any broadcaster, but by the public, held in trust by the government. The government is charged by its citizens through legislation enacted by them through their legislative representatives with regulating those public airwaves, including in a way that protects them from the broadcasters' indecency, and to do so without any subscription fees.

Further, the aforesaid cases involve media as to which the subscriber can only access indecency by logging or dialing into phone numbers, channels or sites out of hundreds, thousands, or even millions available. To the contrary, as found in *Pacifica,* broadcast radio listeners are constantly tuning in and out of a small handful of stations available in any given geographical area of the nation, and that makes accidental exposure more likely. That is even more true of broadcast television, because regardless of the number of broadcast radio stations that can be received in a geographical area, there are only four major broadcast television networks in the U.S., plus PBS, a couple of smaller networks, and a few independent stations. It is very rare to be able to receive more than five broadcast channels that are all of a different network.

\

These basic facts underlie every First Amendment analysis of broadcasting.

19.

X.    THE *DENVER AREA ETC* CASE CITED BY DEFENDANTS IS ALSO

INAPPLICAB LE TO THIS CASE BECAUSE IT WAS A CABLE CASE.

Defendants have also cited *Denver Area ETC v FCC, 518 US 727 (1995)* in support of their

contention that the Supreme Court does not allow direct regulation of speech when there is some

blocking technology. Again, Defendants in doing so ignore the facts that the Supreme Court

decision is limited to its facts, which are inapplicable to this case. A review of the *Denver Area*

*ETC* opinion reveals that was a cable television case, not a public airwaves broadcasting case at

all, like this case is. Further, while Defendants argue that the *Denver Area* decision held a statute

unconstitutional on the basis of the existence of the "V-chip", the truth is that, because it was a

cable television case, and the "V-chip" is only for broadcast television, the *Denver Area ETC*

case had absolutely nothing to do with "V-chips", and the "V-chip" is nowhere mentioned in the

case. In *Denver Area,* there was completely different blocking technology present for cable

television that operates entirely differently than the "V-chip" for broadcast television.  One

example of the difference is that while a cable subscriber can either at their television, converter

box, or by a call to the provider block any channel, the broadcast "V-chip" relies completely for

its operation upon the TV ratings assigned, can only block programs by rating, and then only if

they have a proper rating( which as will be seen, they rarely do).

XI.    THE "V-CHIP" IS A MEANS THAT IS NOT AVAILABLE IN THE

HOMES OF MILLIONS OF AMMERICANS.

Many televisions pre-date the "V-chip" and yet work just fine for their intended purpose. They

still will after February, 2009, with a digital converter (which by the way, DOES NOT contain a

20.

V-chip). There will be older televisions without V-chips in use for decades to come. The Court

needs to look at this from the perspective of the individual families that do not have the blocking

technology, no matter what a minor percentage of the population they may become. In this

nation, we write laws to protect minorities. Many Americans deliberately do not have cable or

satellite television for the express purpose of minimizing the television indecency that can be

accessed in their homes; Defendants seek to tell all Americans that they do not have that choice.


The "V-chip" the Defendants rely on expressly does not exist in televisions with a screen smaller

than 13 inches, as Congress exempted those televisions. It is reasonable for this Court to take

judicial notice that, generally, most smaller televisions end up in childrens' bedrooms, where the

"V-chip" would be most needed, if it actually worked.


Even among the majority of Americans who now have cable or satellite television, there is no

evidence as to what percentage of them have blocking technology. Not all satellite systems do,

and most  satellite television subscribers either cannot or choose not to subscribe to Defendant

Fox' and the other broadcast networks via satellite, either based on unavailability due to

geography, or there is an extra fee.  So those satellite television customers still receive the

broadcast networks over a regular antenna, and do not have any blocking technology, unless they

have a "V-chip."

21.

Overall, more than 30 million American citizens, a number more than the entire population of most countries, do not have any blocking technology for broadcasts whatsoever, and that number will continue well beyond the February, 2009, digital conversion date, which is irrelevant to blocking technology, as stated earlier. No law has been cited that would permit either broadcasters or government to place a burden of having to take steps to avoid indecency upon unconsenting citizens. The legal burden is properly upon the broadcasters to avoid broadcasting it during the daytime hours.

XII.   THE "V-CHIP" RELIED UPON BY DEFENDANTS, UNLIKE THE

BLOCKING TECHNOLOGIES IN *SABLE, PLAYBOY, RENO AND*

*ASHCROFT,* IN TURN RELY UPON TV RATINGS, WHICH IN TURN

ARE ASSIGNED INCONSISTENTLY AND USUALLY INACCURATELY

BY THE NETWORKS, WITHOUT ANY SYSTEM OF

ACCOUNTABILITY.

As has been stated, all of Defendants' arguments as to constitutionality of 18 U.S.C. 1464 and the Commission's regulations thereunder hinge entirely upon their assertions regarding the "V-chip" blocking technology for broadcast television. The "V-chip"'s operation relies completely upon the TV ratings assigned, if assigned at all, to television programs. If a parent/viewer has a "V-chip", they can program it to block all programs assigned a given rating, i.e., "TV-MA", for mature audiences only, as an example. The "V-chip" cannot be programmed to work any other way. This is completely unlike the technologies in the *Sable, Playboy, Reno or Ashcroft, all supra,* cases, in which the Supreme Court found the various technologies individually to be

22.

"reasonably effective", based on the evidentiary record in each case. None of those blocking technologies relied upon ratings, like the "V-chip" does.

Further, the TV ratings are assigned by the television networks themselves, and not all programs are rated. There is no system of oversight or accountability for the accuracy of the ratings, and therefore, the "V-chip" is not within the control of the parent/viewer, as Defendants like to claim, but rather, are controlled by the networks themselves by if or how they rate programs.

Beyond that, there has been uncontroverted evidence in the record of the recent cases of Fox v FCC in the U.S. Court of Appeals for the Second Circuit (now on certiorari to the Supreme Court) and CBS v FCC in the Third Circuit (the Super Bowl case) that the programs that are rated are at least 68% of the time mis-rated as being suitable for children of a certain age group when the objective ratings criteria clearly states otherwise. Sometimes they are off by TWO ratings, i.e., programs meeting the criteria for TV-MA rating instead being rated not TV-MA or even TV-14, but TV-PG. And, there is very strong circumstantial evidence in the record that the networks deliberately engage in that mis-rating of programs in order to avoid losing advertising revenue by essentially admitting to advertisers that the program is not suitable for a group of viewers by age, limiting the market. This mis-rating does not occur "occasionally" as characterized by Defendants in this case, but occurs at least 68% or more of the time. Defendants even tacitly admit this in this case, incredibly claiming that these facts "cast no doubt on whether

23.

the 'V-chip' is effective." In reality, it is impossible to dream up a scenario that would cast more

doubt on the effectiveness of the "V-chip", which, when present, only allows parents to block a

program based on its rating, and when the entity doing the rating, the network, has a financial

incentive to and does inaccurately rate the programs such a high percentage of the time. "V-chip"

operation rests squarely on a correct rating. A .320 average is great for a baseball player, but it is

a pathetic accuracy average for rating television programs to protect children, especially since

the ratings criteria are so unquestionably clear and objective. Therefore, the "V-chip" cannot

block "all objectionable programming" as argued by Defendants; rather, it can only block the

less than 30% of programs that are assigned a rating that is accurate (32% or less of rated

programs rated accurately, minus a reasonable percentage for cases that are not rated at all under

the system).

> XIII.    THE COMMISSION IS NOT LEGALLY BOUND TO ITS PREDICTIONS
> OF THE ACCURACY OF THE "V-CHIP" MADE PRIOR TO ITS USAGE,
> AND UNFORSEEABLE CIRCUMVENTION BY THE NETWORKS.

In the face of Commission findings that the "V-chip" is not effective, unlike the technologies in

the *Sable et al* line of cases above, the Defendants try to bind the Commission, as an admission,

to a report it issued containing advance assessment of the "V-chip". First of all, Defendants have

cited no legal authority that would permanently bind the Commission to that report. Unlike the

judicially established constitutionality of statutes, assessments of the Commission are

changeable. The Commission is not legally bound to its statements in any way that prevents

them from being changed later.

24.

Further, the Commission findings that Defendants assert as binding were mere predictions, made in a report issued prior to the commencement of the usage of the "V-chip." Obviously, predictions of the FCC, like anyone else, can turn out to be wrong. Particularly, it occurs that there is no possible way that the Commission, in making that assessment, could have foreseen what has actually happened. That is that the networks, in assigning the ratings the "V-chip" relies upon, sabotage, circumvent, manipulate, thwart, undermine and gut the effective operation of the "V-chip" by mis-rating the programs at least 68% of the time, in order to avoid losing advertiser revenue. And now, after defeating the effectiveness of the "V-chip", it is those very same networks ( Defendant Fox Television in this case) that go to court and attempt, without evidence, to trumpet the "V-chip" as effective enough to do away with the statute that restricts them from broadcasting any level of indecency at all hours. The reality is that the networks do not want anything at any level, laws or technologies,  to protect the citizenry from their indecency.  The "V-chip" is nothing short of an abysmal failure, an experiment gone awry.

XIV.    18 U.S.C. 1464 IS THE ONLY MEANS OF ACHIEVING THE GOVERNMENT'S INTEREST THAT IS NOT ENTIRELY WITHIN THE CONTROL OF THE NETWORKS, THE ENTITIES FROM WHICH THE CITIZENS NEED PROTECTION.

As mentioned before, the government's interest in this field is to assist parents and viewers in protecting their children and themselves from unchosen and unwanted indecency. No one has yet challenged that substantial interest. Defendants now in this case argue that the "V-chip", and the ratings it relies upon, should be the only means of achieving that interest, and that

25.

the longstanding statute should be stricken. Yet, of the alternatives, if there really are any, 18

U.S.C. 1464 is the only means of achieving the government's interest, along with the

Commission's regulations under it, that is not within the control of the Defendants and other

broadcasters, i.e., the "speakers." The scheme advanced by the Defendants, the "V-chip", is

entirely within their control, as explained earlier. It does not serve the undisputed interest of

assisting parents/viewers in protecting their children and themselves from indecency from the

broadcasters, to leave their only means as a "V-chip" blocking technology that operationally

relies upon the ratings assigned by the broadcasters, usually deliberately assigned inaccurately,

with no oversight or accountability. This would leave parents truly out there, on their own, with

no assistance, because the government would be out of the picture. The broadcasters work

adversely to this interest, since they generate the indecency that there is need to protect against.

This proposed scheme makes no sense whatsoever - legally, factually or, practically.

> XV.    THE ARGUMENT OF DEFENDANTS THAT VIEWERS CAN USE A "V-
> CHIP" TO BLOCK UNWANTED PROGRAMS, RENDERING THE
> STATUTE UNCONSTITUTIONAL, IS LEGALLY INDENTICAL TO
> THAT REJECTED IN *PACIFICA* THAT VIEWERS CAN BLOCK
> PROGRAMS BY THE CHANNEL OR ON/OFF BUTTONS.

Defendants in this case, and all four major television broadcast networks in other recent cases,

have been more and more blatantly arguing that the broadcast television "V-chip" is a

technology that has been invented since *Pacifica, supra,* was decided, and that it somehow gives

26.

rise to a legal reason to now strike down 18 U.S.C. 1464 as unconstitutional. But while the "V-chip" indeed is a new technology that did not exist in 1978, and aside from its ineffectiveness and all of the other legal arguments, the existence of blocking technology for broadcasting is nothing new, when one really thinks about it. The arguments now being advanced by Defendants in this case, and the networks in a few other cases, are legally identical and analogous to the arguments that Pacifica Foundation made that were rejected by the Supreme Court.

In *Pacifica, supra,* the Supreme Court totally rejected the contention that unconsenting listeners of broadcast radio, including parents seeking to shield their children from indecency, can simply change radio stations or turn the radio off, as any justification to find statutory regulation of broadcast indecency unconstitutional. It cannot be disputed that the same principle applies to broadcast television, with channel changing and on/off buttons as well. So while Defendants and the other networks legally attempt to use the "V-chip" as a new technology with which to somehow re-visit *Pacifica,* what *Pacifica* itself instead requires is that its holding be applied analogously to the facts of the "V-chip." And, when *Pacifica* is applied, we see that the Supreme Court has established as law in the field of broadcasting, that technology enabling listeners/viewers to avoid indecency, whether it be the on/off button, the channel changer, or the "V-chip", is absolutely not a legal reason to find 18 U.S.C. 1464 unconstitutional. In fact, the "V-chip" is even less of a reason to affect change to the law, because unlike the on/off and channel buttons or controls that every broadcast television or radio has, older televisions do not have "V-chips" at all. So, the "V-chip" is a less universal technology than those rejected as in

27.

*Pacifica* as a legal means of protection.

XVI.   AMERICAN CITIZENS RELY COMPLETELY UPON 18 U.S.C. 1464 AS
PROTECTION FROM INDECENCY IN THEIR HOMES AND PUBLIC
PLACES, WHERE DECENCY IS THE NORM IN A CIVILIZED
SOCIETY, BY DEFINITION.

18 U.S.C. 1464 is part of the Radio Communications Act of 1934. This statute was enacted

before or shortly after television was invented, and was primarily applied only to radio

originally. It apparently has since been applied by everyone to television broadcasts as well, as a

form of radio transmission, and no one has legally challenged that application. During that

seventy plus years, all American citizens, whether they consciously think about it, or

subconsciously, have come to completely rely upon the protections against broadcast indecency

in that statute.  For most Americans, for their entire lives, this law has existed as foundational

fact, as they go about their lives at home, in public, and other places. It has been well known that

there are just some things that cannot be shown or said on broadcast radio or television. Because

of that, people feel free to have broadcasting turned on wherever they are, whatever they are

doing, or whoever they are with, without concern for having to constantly be on hair-trigger alert

to monitor for and avoid indecency, at least during daytime hours. To now strike down 18 U.S.C.

1464 in favor of a technology that not all citizens have, that no one has the legal burden of

purchasing, that is not universally applied to all programs, that is inaccurate about 70% of the

time and ineffective virtually all of the time, and which requires constant programming and

monitoring of ratings, would amount to not only pulling the rug out from under the very lives of

28.

all American citizens, it would amount to also pulling up the floor, the foundation, and the very ground beneath them. It would be a legal earthquake of an unparalleled magnitude.


Decency is the norm, not the exception, in a civilized society and nation, and always will be. Our laws and court rulings must always reflect that, to maintain civilization.

> XVII.  THE "V-CHIP" FOR BROADCAST TELEVISION CANNOT POSSIBLY
> PROVIDE ANY BASIS FOR A FINDING THAT INDECENCY
> RESTRICTIONS IN 18 U.S.C. 1464, THE "RADIO COMMUNICATIONS
> ACT OF 1934', ARE UNCONSTITUTIONAL, ESPECIALLY WHEN
> THERE DO NOT EXIST ANY BLOCKING TECHNOLOGIES OR
> RATINGS FOR BROADCAST RADIO.

18 U.S.C. 1464 is part of the "Radio Communications Act of 1934." The statute is primarily addressed to broadcast radio. There is no claim that there exists for broadcast radio any "V-chip", similar or other blocking technology, or ratings. Therefore, the advent of the "V-chip" technology or ratings for **broadcast television** cannot possibly be a legal basis for finding unconstitutional direct statutory restriction or regulation of **broadcast radio** indecency. And, obviously, direct regulation of broadcast radio indecency starts with the Radio Communications Act of 1934, in section 1464.


If this Court were to find that 18 U.S.C. 1464 is unconstitutional, is would necessarily have to do

29.

so in its entirety, as to both television and radio, since the statute does not distinguish. Either the statutory section is constitutional or it is not. And, if the Court were to find 18 U.S.C. 1464 unconstitutional , as Defendants argue, that would necessarily leave the entire citizenry of the United States without any laws, rules, blocking technologies, ratings, or any other protection against any level of broadcast radio indecency at any hour. This would not only clearly violate *Pacifica, supra*, which was a radio case, but would lead to a completely chaotic, "anything goes" "free for all" in broadcasting, with no accountability or responsibility by anyone to anyone else. As another reason why the "V-chip" is not a substitute for the statute – it does not exist for radio.

## CONCLUSION AND REQUEST

Defendants' constitutional challenge is without merit and easily overcome for seventeen separate reasons. Each and every one of the foregoing seventeen separate arguments are individually, in and or themselves, sufficient to defeat the Defendants' attempt to raise a constitutional issue as to 18 U.S.C. 1464. There is no issue whatsoever. In fact, it is no exaggeration to say that Defendants' constitutional challenge to 18 U.S.C. 1464 in this case is most likely the weakest and most frivolous argument ever advanced to a U.S. court. Unless or until legislatively amended by Congress, or some amendment to the First Amendment to the U.S. Constitution, 18 U.S.C. 1464 is permanently constitutional.

Inspection of Defendants' constitutional arguments reveals a clear pattern of thought on their part: Defendants do not want any rules or technology that can block their indecent conduct; if there are rules, they are to be ignored and disregarded as inconvenient to their agenda; and

30.

Defendants further argue that the Commission and courts should all engage in a form of activism that is illegal by also ignoring and disregarding their legal duties, mandates and regulations, and instead act based on the whimsical fact of the development of the "V-chip" technology that they control, without any legal basis for doing so. Defendants simply seek to accomplish by judicial fiat what they cannot through the proper legal channels of a Congress that represents America's citizens.

Amicus Curaie Decent TV, from the perspective of the television viewing public and citizens, requests the Court find 18 U.S.C. 1464 constitutional, consistent with binding U.S. Supreme Court precedent. The further non-constitutional issues are left by this Amicus Curaie to the Court and the parties without argument.

Attorneys for Decency Enforcement Center for Television

Date: August 4, 2008

_____

Thomas B. North

1387 N. State St., #11

St. Ignace, MI 49781

Date: August 4, 2008

_____

Christopher T. Craig

31.

6862 Elm St.

Ste. 360

McLean, VA  22101

32.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Fox Television Stations, Inc., Licensee of Stations | ) Civil Case No.1:08-cv-00584-PLF |
| KMSP-TV, WJBK (TV), and WTTG (TV), | ) |
| Defendants. | ) |
| | ) |

**Certificate required by LCvR 7.1 of the Local Rules of the United States District Court for the District of Columbia (and Statement required by FRCP 7.1)**

I, the undersigned, counsel of record for Decency Enforcement Center for Television, certify to the best of my knowledge and belief, that Decency Enforcement Center for Television has no parent company, and no publicly held company owns 10% or more of its stock. (Incorporated on a non-stock basis).

These representations are made in order that the judges of this court may determine the need for recusal.

Date: August 4,2008

Thomas B. North

Attorney of Record for

Decency Enforcement Center for Television